MARIE NICOLLE LES BOIS, PLAINTIFF IN ERROR, v. SAMUEL BRA-
MELL, DEFENDANT.

A private survey of land, claimed under an old Spanish concession and presented
to the board of commissioners appointed under the act of 1805, is not conclusive
against the party presenting it to show the boundaries of the claim, but is proper
evidence to go to the jury, who are to decide upon its limits.

Under the acts of 1824, 1826, and 1828, the District Court of Missouri was author-
ized to receive petitions of claimants to land, until the 26th of May, 1829. In
1831, when claims which had not been presented were standing under a bar,
Congress confirmed the title of the inhabitants of the town of St. Louis to the
adjacent commons. This act was valid, unless the opposing claimant then pos-
sessed a vested interest which was protected by the Louisiana treaty.

By the third article of that treaty, the inhabitants were to be protected in their
property.

But land held under a concession and survey was not finally severed from the
royal domain and converted into private property.

The power of granting the public domain was in Morales, who resided in New
Orleans. His regulations were in force in Upper Louisiana, and by them the
title to land held under a concession and survey was not perfected until ratified
by him and a final grant issued.

This power was in a great degree a political power, and, by the treaty, the United
States assumed the same exclusive right to deal with the title, in their political
and sovereign capacity. The courts of justice cannot, without legislation,
execute the power, because the holder of an incomplete title has no standing in
court.

A confirmatory act, passed by Congress in 1836, does not reach back to the original
concession, and exclude grants of the same land made in the intermediate time,
either by Congress itself, or a board of commissioners, or the District Court,
acting under its authority.

In the act of 1836, Congress had in view the situation of persons whose titles
were, by that act, confirmed to lands which had been previously granted to
others, and, in order to meet the case, provided that such confirmed claimants
might take up, elsewhere, an amount of public land equal to that which they
lost.

The confirmatory act of 1836 must, therefore, be construed to exclude the com-
mons which had been granted, by previous acts, to the town of St. Louis.

These acts, and a survey by the proper public officer in 1832, placed the title of the
town in the same condition as if a patent had been issued.

THIS case was brought up, by writ of error, from the Circuit
Court of the United States for the District of Missouri.

It was exactly the same, in most of its points, with the case of
Mackay and others v. Dillon, reported in a preceding part of this
volume. Reference will be made to that case in all the points
which are similar.

It was an action of ejectment brought by Les Bois, in the Cir-
cuit Court, to recover two hundred and forty-four arpents and fifty
perches of land, claimed under a Spanish concession. The de-
fendant, Bramell, claimed title under the acts of Congress of 1812
and 1831, granting a right of common to the town of St. Louis.

The plaintiff's title was as follows.

1. A petition, concession, and survey.

2. Proceedings of the board of commissioners established by
the act of Congress passed on the 2d of March, 1805.

3. Proceedings of the board of commissioners established by the acts of July 9th, 1832, and March 2d, 1833.

. 4. The act of Congress passed on the 4th of July, 1836.

5. A certificate of the surveyor of the public lands, dated September 6, 1838.

These will be taken up in order.

I. A petition, concession, and survey.

The petition was as follows: —

"To Don Charles Dehault Delassus, lieutenant-colonel attached to the stationary regiment of Louisiana, and lieutenant-governor of the upper part of the same province.

"Marie Nicolle Les Bois has the honor of representing to you, that, having lost her father and mother since her most tender years, in consequence of a well known disaster, which alone would be sufficient to render her situation interesting to all men of feelings, and having had for support since that moment an uncle and aunt, both respectable, who have taken care of her infancy, considering that time in his flight deprives her every day of some one of her protectors; that her brothers and sisters are all married, and loaded with family, and without fortune; that she remains as an isolated being, who cannot expect any assistance of any one whomsoever; and who, without fortune, finds herself under several points of view in a calamitous situation, which appears to her to be worthy to attract the attention of the good heart every body knows you possess. Full of this idea, and convinced of the generosity of the government, which has never ceased to grant favors to the unfortunate, and to be particularly the protector of orphans, she hopes you will be pleased to grant to her the concession of a tract of land situated to the south of this town, and being vacant lands of his Majesty's domain, and which may contain two hundred and thirteen arpents in superficie, more or less; which land shall be bounded as follows: to the north, south, and west, by the vacant lands of the domain, and to the east by a concession of some width belonging to Mr. Antonio Soulard.

"Such is the statement of my misfortune and pretensions, and I presume to hope this favor of the generosity of a benevolent and generous government, and of a chief as worthy as you are to fulfil its benevolent intentions.

MARIE NICOLLE LES BOIS.

"St. Louis, May 10, 1803."

The concession was as follows: —

"St. Louis of Illinois, May 11th, 1803.

"Having seen the foregoing statement, I do grant to Marie Nicolle Les Bois, for her and her heirs, the land which she solicits, in case it is not prejudicial to any person; and the surveyor of this

Upper Louisiana, Don Antonio Soulard, shall put the petitioner in possession of the quantity of land she solicits in the place designated ; which, when executed, he shall draw out a plat of survey, delivering the same to the party, with his certificate, in order to serve to her to obtain the concession and title in form from the intendant-general, to whom alone corresponds, by royal order, the distributing and granting of all classes of lands of the royal domain.

CARLOS DEHAULT DELASSUS,"

*Of Survey.* — *Upper Louisiana, District of Sn. Luis de Illinois.*

The survey was as follows : —

*Note.* The bounds set to all corners are shown on the plat.

All the line-trees were marked with one blaze above two notches. The trees on both sides of the lines were blazed only.

Registered in book B, of the surveys for said district, folio 17, No. 20.

*Of Certificate of Survey.*

" Don Antonio Soulard, surveyor-general of Upper Louisiana, — I do certify that I have measured, run the lines, and bounded, in favor of Marie Nicolle Les Bois, a piece of land of two hundred and forty-four arpents and fifty perches in superficie, measured with the perch of the city of Paris, of eighteen French feet in length, lineal measure of the said city, according to the agrarian measure of this province ; which land is situated at about the distance of twenty-five arpents to the southwest of this town of Saint Louis, and is bounded to the north-northwest by lands of Don Santiago Mackay ; to the east-southeast by lands belonging to me ; to the south-southwest in part by lands of Don Jh. Brazeau, and by vacant lands of the royal domain ; and by the west-southwest by vacant lands ; which measurement and survey I took without regarding the variation of the needle, which is 70° 30' east, as is evident by the foregoing figurative plat, on which are noted the dimensions, directions of the lines and limits, and other boundaries, &c.

" Said survey was executed by virtue of the memorial and decree of the lieutenant-governor and sub-delegate of the royal fisc, Don Carlos Dehault Delassus, dated 11th May, 1803.

" In testimony whereof, I do give the present, with the preceding figurative plat, executed by my exertions on the 27th of May of the current year, in St. Louis, August 20, 1803.

ANTONIO SOULARD, *Surveyor-General.*

" Truly translated, St. Louis, December 15, 1832.

JULIUS DE MUN."

2. Proceedings of the board of commissioners established by the act of Congress passed on the 2d of March, 1805.

*Proceedings of Commissioners.*

" *Friday, October 7th,* 1808.

" Board met. Present: The Honorable Clement B. Penrose and Frederick Bates.

" Marie Nicolle Les Bois, claiming two hundred and forty-four and one half arpents of land, situated in the commons of St. Louis, produces to the board a concession from Don Charles Dehault Delassus, lieutenant-governor for the same, dated May 11th, 1803; a plat and certificate of survey, dated 27th May, 1803, and certified 20th August, same year.

" Laid over for decision; board adjourned.

CLEMENT B. PENROSE.
FREDERICK BATES."

" *Wednesday, August 21st,* 1811.

" Board met. Present: Clement B. Penrose and Frederick Bates, commissioners.

" Marie Nicolle Les Bois, claiming two hundred and forty-four and one half arpents of land, see book No. 3, p. 282. It is the opinion of this board that this claim ought not to be confirmed.

" Board adjourned until to-morrow, eight o'clock, A. M.

CLEMENT B. PENROSE.
FREDERICK BATES."

3. Proceedings of the board of commissioners, established by the acts of July 9, 1832, and March 2, 1833.

" *Thursday, November* 39, 1832.

" Board met pursuant to adjournment. Present: Lewis F. Linn [and] F. R. Conway, commissioners.

" Marie Nicolle Les Bois, by her legal representatives, claiming two hundred and forty-four and a half arpents of land, see book C, pp. 73, 74, and 75, No. 3, p. 282, No. 5, p. 328, produces a paper, purporting to be an original concession for two hundred and thirteen arpents of land, more or less, from Charles Dehault Delassus, dated 11th of May, 1803; also a paper, purporting to be a plat and certificate of survey for two hundred and forty-four arpents and fifty perches, taken 27th of May, and certified 20th of August, 1803, by Antonio Soulard.

" M. P. Leduc, duly sworn, saith, that the signature to said concession is in the proper handwriting of the said Charles D. Delassus, and the signature to said certificate of survey is in the proper handwriting of said Soulard.

" The board adjourned until to-morrow at ten o'clock, A. M.

L. F. LINN.
F. R. CONWAY."

*No.* 39.

" *Tuesday, November 5th,* 1833.

" The board met pursuant to adjournment.   Present: L. F. Linn, A. G. Harrison, F. R. Conway, commissioners.

" Marie Nicolle Les Bois, claiming two hundred and forty-four and a half arpents of land, see pp. 64 and 65 of this book (No. 6). The board are unanimously of opinion that this claim ought to be confirmed to the said Marie Nicolle Les Bois, or her legal representatives, according to the concession.

" The board adjourned until to-morrow at nine o'clock, A. M.
                    L. F. LINN.
                    F. R. CONWAY.
                    A. G. HARRISON."

4. The act of Congress, passed on the 4th of July, 1836.

The purport of this act is set forth, under the eighth head of the plaintiff's title, in the case of Mackay *v.* Dillon.

5. A certificate of the surveyor of the public lands, dated September, 6, 1838.

This certificate is as follows:—

*Plat and Certificate of Survey, by Authority of the United States.*
                    " Survey No. 3,184.

" Plat and description of the survey of a tract of two hundred and four arpents and fifty perches, equal to two hundred and eight acres of land, situated in township forty-five, north of the base line, range seven, east of the fifth principal meridian, in the State of Missouri, executed on the twenty-fifth day of September, eighteen hundred and thirty-eight, by Charles De Ward, deputy surveyor, under instructions from the surveyor of the public lands in the States of Illinois and Missouri, dated the sixth day of September, eighteen hundred and thirty-eight.

" This being the tract of land granted, on the eleventh day of May, eighteen hundred and three, to Marie Nicolle Les Bois, by Charles Dehault Delassus, then lieutenant-governor, for the government of Spain, of the province of Upper Louisiana, surveyed on the twenty-seventh day of May, eighteen hundred and three, by Antoine Soulard, Spanish surveyor of the same province, and confirmed to the said Marie Nicolle Les Bois, or her legal representatives, by the act of Congress of the United States, approved the fourth of July, eighteen hundred and thirty-six, entitled ' An act confirming claims to land in the State of Missouri, and for other purposes,' according to the decision, numbered thirty-nine, of the report of the board of commissioners appointed by the act of Congress, approved the ninth of July, eighteen hundred and thirty-two, entitled ' An act for the final adjustment of private

land claims in Missouri.'; and the act of Congress, approved the second of March, eighteen hundred and thirty-three, supplemental thereto."

Then follows a minute description of the land by metes and bounds.

### Defendant's Title.

The evidence offered by the defendant consisted of the first six heads of the title offered by the defendant, in the case of Mackay *v.* Dillon.

He further offered a plat and survey of the common, made in November, 1832, under instructions from the surveyor of public lands in the States of Illinois and Missouri, and the following certificate : —

" Surveyor's Office, *St. Louis, 7th of April,* 1841.

" The foregoing plat and description of the survey of the commons of St. Louis are correctly copied from pp. 74, 75, and 76 of record-book C, in this office. The plat of the survey, No. 3,184, subsequently made of the claim of Marie Nicolle Les Bois, within the survey of said commons, is this day laid down on the said foregoing plat of the common, according to the survey of the said claim of Marie Nicolle Les Bois.

WILLIAM MILBURN,
*Surveyor of the Public Lands in the States of Illinois and Missouri.*"

The evidence being closed on both sides, the counsel filed the following agreement.

### Agreement by Parties.

It was agreed by the parties, that, at the time of the commencement of this suit, the defendant was in the actual possession and occupation of twenty acres of land, parcel of the tract of land in the declaration mentioned, as tenant of the city of St. Louis, claiming the same as common belonging to the inhabitants of St. Louis, and further, that the matter of dispute in this action exceeds the value of two thousand dollars, exclusive of costs.

It was also admitted by the parties, that, from a short time after the settlement of the village of St. Louis, there was a fence, commencing above the town of St. Louis, running westwardly, a little west of the village, until it came to the hill near the court-house, and then ran in a direction south of west, until it reached the line of the Barriere des Noyer fields, and then running southwardly along the front of those fields, until it reached the Carondelet fields, and from that point extended to the river. The land on the eastern side of that fence was used by the inhabitants of the town for the pasturage of cattle, and for the supply of wood, and was al-

ways called the common of the town, while the land on the western side was used for cultivation. The land in question lies on the eastern side of this fence, and within what was called the common. The fence above mentioned was destroyed in the year 1797, at which time the cultivation of the common fields west of said fence was discontinued.

The counsel for the plaintiff then moved the court to instruct the jury, that the survey offered by the inhabitants of St. Louis, in support of their claim, upon which survey was laid down, at the request of the claimants, the concession and survey of Marie Nicolle Les Bois, excludes and protects from the confirmatory operation of the acts of Congress of 13th June, 1812, and act of Congress of 27th June, 1831, the title of said Marie Nicolle Les Bois to the tract granted to her.

Which instruction the court refused to give ; to which decision the plaintiff, by her counsel, excepted.

### Instructions given.

The court then instructed the jury as follows : —

1. That the inhabitants of the town of St. Louis were confirmed in their claim to commons by the acts of Congress of 1812 and 1831.

2. That the notice of claim of said inhabitants, as filed with the recorder of land titles, and exhibited before the board of commissioners, read here to the jury, is evidence of the extent of the said claim to said commons.

3. If the claim of the plaintiff is included within the boundary of the lands confirmed to the town of St. Louis by the acts of 1812 and 1831, then the jury must find for the defendant ; because those acts passed the title to the land in controversy to the inhabitants of said town.

To which opinion of the court, in giving the said instructions, the plaintiff, by her counsel, excepted. And the plaintiff prays the court to sign and seal this bill of exceptions, which is done accordingly, this 14th day of April, 1841.

J. CATRON.    [SEAL.]<br>R. W. WELLS.   [SEAL.]

Under these instructions, the jury found for the defendant, and to review them the present writ of error was brought.

The cause was argued by *Mr. Magenis*, who made the following points : —

1. That the grant and order of survey by the lieutenant-governor, in May, 1803, and the survey made in conformity thereto, raise a legal presumption, that at that date the land so granted and surveyed was royal domain.

2. That the evidence given on the part of the defendant was not sufficient to rebut that presumption.

3. That by virtue of said grant and survey the plaintiff was, in contemplation of law, in possession of the land in dispute on May, 1803, and could not be divested thereof under the act of 1812, except by actual exclusive adverse possession of the same as commons by the inhabitants of St. Louis up to the 20th of December, 1803.

4. That the grant and survey to the plaintiff gave her such a right to the premises as came within the term "property," under the treaty of Louisiana, and that notice of her claim having been duly filed by the recorder, she could not be divested thereof by the act of 1812 or 1831.

5. That by the act of 1812, legal proof before the recorder of continued inhabitation, cultivation, or possession prior to and up to the 20th of December, 1803, was made a condition precedent to the confirmation of claims to lots or land under that act, and that unless the recorder, upon the proof made, confirmed the claims submitted to him for investigation, or reported them to Congress for confirmation, the same are not confirmed by the act of 1812 or that of 1831.

6. That the plat and survey of Mackay, if received as evidence of the extent and boundaries of the land claimed as commons, are evidence also to show that the tract granted to the plaintiff was not claimed as commons, or confirmed to the inhabitants of St. Louis as such, by the act of 1812 or 1831.

Mr. Justice CATRON delivered the opinion of the court.

This case comes up by a writ of error to the Circuit Court of the District of Missouri. It is an action of ejectment for two hundred and eight acres of land, lying within the commons of St. Louis, and confirmed to the plaintiff by the act of Congress of July 4, 1836 ; and was surveyed by the authority of the United States, in September, 1838. The act of 1836, and the survey, make out a good *primâ facie* title for the plaintiff.

The defendant claims title under the city of St. Louis ; and the title of the city depends on its grant of the commons by the acts of 1812 and 1831. The evidence of identity and boundary of neither claim being disputed, the plaintiff moved the court to instruct the jury, that the survey offered by the inhabitants of St. Louis in support of their claim, upon which survey was laid down, at the request of the claimants, the concession and survey of Marie Nicolle Les Bois, excludes and protects from the confirmatory operation of the acts of Congress of 13th June, 1812, and act of Congress of 27th June, 1831, the title of said Marie Nicolle Les Bois to the tract granted to her ; which instruction was refused. The survey referred to was one made of the commons in

1806, by James Mackay; and on a plat of the survey, filed with a notice of claim before the board of commissioners organized by virtue of the act of 1805, to examine and report on French and Spanish claims, this of *Les Bois* was laid down, with six others. Mackay's survey was a private one, made at the instance of the inhabitants of St. Louis, and was not binding on the rights of any one; nor did it profess to exclude the pretensions laid down on the plat, as not being part of the town common, but the reverse. For our further views on the question presented by the instruction, we refer to what is said on it in the case of Mackay's heirs *v.* Dillon, submitted to us at the same time with the present.

The court then instructed the jury as follows : —

1. That the inhabitants of the town of St. Louis were confirmed in their claim to commons by the acts of Congress of 1812 and 1831.

2. That the notice of claim of said inhabitants, as filed with the recorder of land titles, and exhibited before the board of commissioners, read here to the jury, is evidence of the extent of the said claim to said commons.

3. If the claim of the plaintiff is included within the boundary of the lands confirmed to the town of St. Louis by the acts of 1812 and 1831, then the jury must find for the defendant; because those acts passed the title to the land in controversy to the inhabitants of said town.

These were excepted to.

As to the first instruction given, it may be remarked, that by the act of June 13, 1812, Congress provided, that the rights, titles, and claims to town or village lots, out lots, common field lots, "and commons," in, adjoining, and belonging to St. Louis (and other towns) should be, and the same were, thereby confirmed to the inhabitants, &c.

That this was a general confirmation of the common to the town as a community no one has ever doubted, so far as the confirmation operated on the lands of the United States ; and to which no individual claim or pretension was set up ; and the question arising on the instruction is, whether the plaintiff's claim was excepted directly, or by reason of a prior right vested in the plaintiff. The only direct exception in the act is the proviso, — "That nothing herein contained shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the 'board of commissioners' for adjusting and settling claims to land in the said territory."

The board referred to was organized according to the act of March 2, 1805, with powers to examine such claims as that of the plaintiff, and to decide on their validity ; and although, by the act, no power was given to make a conclusive adjudication without the sanction of Congress, yet if any claim was declared good and

valid, and recommended for confirmation, it was of the class mentioned in the foregoing proviso, as we suppose, even when acted on under the act of 1805 ; but by the act of March 3, 1807, § 41, the powers of the commissioners were extended, and confirmations of various classes of claims were authorized to be made by the board conclusively, without the intervention of Congress ; and for which patents were to issue, on surveys made by officers of the United States.

The foregoing were the only description of titles excepted from the act of 1812 ; and as the plaintiff's was not one of them, the act did not apply to it in the saving clause.

The next inquiry on the first instruction given is, as to the operation of the act of 1831 on the plaintiff's claim.

The act of May 26, 1824, gave jurisdiction to the District Court of the United States for the Missouri District, to hear and adjudge, in a mode of proceeding according to the rules governing courts of equity, on all claims of the description, and that were in the situation, of the plaintiff's, — the United States being defendants ; and either party having the right of appeal to the Supreme Court.

The fifth section of the act declares, — " That any claim not brought before the District Court within two years from the passing thereof shall be for ever barred, both in law and equity ; and that no other action at common law, or proceeding in equity, shall ever thereafter be sustained in any court whatever, in relation to said claim."

An act for the relief of Phineas Underwood, and for other purposes, passed the 22d May, 1836, § 2 (1 United States Land Laws, 924), declares, that the time for filing petitions under the act of 1824 shall be and is hereby extended to the 26th day of May, 1828.

The act of May 24th, 1828 (4 Lit. & Brown's ed., ch. 90, 298), declares, that the District Courts shall be open for the receiving petitions of claimants, under the act of 1834, until the 26th day of May, 1829, and that the act shall continue in force for the purpose of enabling claimants to obtain a final decision on their claims until the 26th day of May, 1830, and no longer.

The plaintiff instituted no proceedings before the District Court under the act of 1824 ; and on the 26th day of May, 1829, her claim stood and was barred. For further views of this court on the character of the bar, we refer to the cases of Barry *v.* Gamble, 3 Howard, 55, and Chouteau *v.* Eckhart, 2 Howard, 352.

In January, 1831, the city of St. Louis, and other towns, applied to have their rights of common further confirmed and regulated ; and an act of Congress was passed, declaring — " That the United States do hereby relinquish to the inhabitants of the several towns of St. Louis, &c., all the right, title, and interest in and to

the town or village lots, out lots, common field lots, and commons, — to be held by the inhabitants of the said towns in ' full property,' and to be regulated, or disposed of, for the use of the inhabitants, according to the laws of the State of Missouri." This law vested in the city corporation the town common, in fee simple, and gave full power to the legislature of Missouri to incorporate it into the city, by extending the city charter over it. The importance of the act will be understood, when we examine the plats and other evidences in the record ; from which it will be seen, that the city is spreading over the eastern lines of the common, and that it is in part sold out in lots by the corporation already, and fast becoming part of the city.

Les Bois standing barred when the act of 1831 was passed, in November, 1832, the city caused the common to be officially surveyed, under instructions from the surveyor-general of Illinois and Missouri, according to the act of 26th May, 1834, § 2 (1 United States Land Laws, ch. 311). This survey was a public one, binding on the United States and the city corporation ; and was duly recorded by the surveyor-general in his office. A copy of the plat is in the record, with a detailed description of landmarks, courses, and distances ; and these were given in evidence to the jury in the Circuit Court. Thus stood the defendant's title. On July 9th, 1832, a law was passed by Congress, authorizing commissioners to be appointed to act on claims not confirmed previously ; and on the 5th of November, 1833, the board organized under the act declared Les Bois's claim valid ; and Congress confirmed it, July 4th, 1836.

To avoid the bar, under these circumstances, and to show that neither the act of 1812, or that of 1831, could deprive the plaintiff of her right, it is insisted, she had a vested interest to the land confirmed, when the United States acquired Louisiana, which is protected by treaty stipulation, and that such right no act of Congress could defeat ; that by the third article of the treaty of 1803, with France, the inhabitants of the ceded territory were to be incorporated into the Union, to be admitted to the rights, advantages, and immunities of citizens of the United States, and in the mean time they were to be maintained and protected in the free enjoyment of their liberty, property, and religion. And this implied, that after their admission they should be equally protected, and that such would have been the measure of justice applicable to their rights of property by the laws of nations, had the treaty been silent on the subject. On this assumption the plaintiff mainly relies ; that it is true in the abstract is not doubted, but it involves several opposing considerations applicable to her title : — 1. Whether such a vested property in the soil existed in Les Bois, before the date of the treaty, as bound the government of Spain to perfect, by the execution of a complete title, the first incipient step. 2. Wheth-

er the judicial power has any jurisdiction to interfere and enforce such right, supposing it to exist.

That this government had imposed on it the same duty to perfect the title that rested on Spain before the country was ceded is not open to question ; but this was all the United States were bound to perform. How, then, did the plaintiff's claim stand previous to the cession. Her first decree and order of survey bear date in May, 1802, and the survey was made in August, 1803 ; but there is no evidence that any part of the land was either occupied or cultivated. The lieutenant-governor's decree is in the usual style, and concludes, " that it is given to serve the interested party to obtain the concession and title in form, from the intendant-general, to whom alone corresponds, by royal order, the distributing and granting of all classes of the royal domain."

On the 22d of October, 1798, the king of Spain appointed Morales intendant-general and sub-delegate ; he kept his office at New Orleans, and was charged with the superintendence and granting of the public domain in the provinces of Upper and Lower Louisiana, " to the conclusion of all other authority." On July 17th, 1799, Morales published his regulations to the inferior officers and the people of the provinces, so that (in his own language) " all persons who wish to obtain lands may know in what manner they ought to ask for them, and on what conditions lands can be granted and sold ; that those who are in possession without the necessary titles may know the steps they ought to take to come to an adjustment ; that the commandants and sub-delegates of the intendancy may be informed of what they ought to observe," &c. 2 White's Recopilacion, 234.

By article eighteen, it is declared, — " Experience proves, that a great number of those who have asked for land think themselves the legal owners of it ; those who have obtained the first decree, by which the surveyor is ordered to measure and put them in possession, others after a survey has been made, have neglected to ask the title for the property, and as like abuses continuing for a longer time will augment the confusion and disorder which will necessarily result, — We declare that no one of those who have obtained said decrees, notwithstanding in virtue of them the survey has taken place, and that they have been put in possession, can be regarded as owners of land until their real titles are delivered completed, with all the formalities before recited."

The formalities recited are found in the three preceding sections, which give precise instructions how the title is to be made out, and where it is to be recorded, by the officers of the general intendancy. The nineteenth article declares, — " All those who ' possess ' lands in virtue of formal titles made by the governors [such as Delassus was] shall be protected and maintained in their possessions." And by article twenty, — " Those who, without the title or pos-

session mentioned in the nineteenth article, are found occupying lands, shall be driven therefrom, as from property belonging to the crown," unless they have occupied the same more than ten years.

The board of commissioners who confirmed Les Bois's claim acted on the principle, that the regulations of Morales were not in force in Upper Louisiana, more than those of the royal governors, O'Reilly and Gayoso. But as the Lieutenant-Governor, Delassus, referred the claimant in this case, and in all others so far as we know, to the general intendant for a title, and the instructions point out the terms on which a complete title can be had, and the formalities with which it must be clothed, it is difficult to say on what grounds the commissioners come to the conclusion that Morales's regulations were not in force. The rules of proceeding of the board will be found in 5 D. Green's State Papers, 707, and the instructions to which they refer in 2 White's Recopilacion, 228 – 244.

In an affidavit found in the public documents, and furnished by the same board (5 D. Green's State Papers, 708), Delassus states his practice to have been, that, when a petition was presented for land, if he considered the petitioner possessed merits to entitle him to the concession it was granted, subject to the confirmation of the intendant-general, and that he made an order of survey ; these he delivered to the petitioner ; but that he kept no books, nor did he make any registry of the decree or order of survey ; and that whether the surveyor did so or not was no concern of his, the lieutenant-governor's, nor did he deem it material when the survey was made ; as to this, there was no time limited.

From this loose mode of proceeding, it is manifest the whole matter of perfecting the title was referred to the intendant-general ; and he, and those acting subordinate to him in this respect, were undoubtedly governed by the intendant's regulations. As the king's representative and deputy, he was to judge whether the considerations moving the lieutenant-governor were such as warranted the grant ; next, whether conditions had been performed, &c. The granting power was in a great degree political, and altogether the exercise of royal authority, and of course subject to no supervision but by the same high authority itself. By the treaty, the United States assumed the same exclusive right to deal with the title in their political and sovereign capacity, nor could the courts of justice be permitted to interfere ; if they could, and by their decrees complete the title, all power over the subject might have been defeated, not by the courts of the Union only, but by the State courts also. And therefore the contemporary construction and practical understanding of the treaty for forty years has been, that claims like the plaintiff's had no standing in a court of justice until confirmed by Congress, or by its authority.

Next, it is insisted that the confirmation of 1836 established the

MM *

original validity of Les Bois's title ; that this stands as an adjudged and concluded fact, which a court of justice cannot controvert ; and the confirmation having operated on the concession of 1802, therefore, by relation, it overreaches the confirmations of the town common of 1812 and 1831.

The doctrine of relation, in an action of ejectment, by which the legal title by patent is made to take date from the entry or inception of title, is familiar in some of the States, and has been acted on in this court. It applies where both the litigant parties have a grant ; the case of Ross *v.* Barland, 1 Peters, 655, was of this description. There the younger patent was founded on the best right in equity, standing in advance of either patent, and the equities were tried at law. But if the elder or better entry had not been carried into a grant, a court of equity might have administered the same measure of justice, and decreed the land from the patentee, whose legal title was founded on the inferior equity. This is the constant practice in the State courts in similar cases. But when courts of law go behind conflicting patents, and contest the equities on which they are founded, it has never been held that the patent aided the equitable title ; it must come in support of the grant, and stand on its own merits. So in this case ; the plaintiff admits her grant, of itself, is insufficient to authorize a recovery, and that she must go behind it ; — and there she is met by the objection, that her claim had no standing in a court of equity or of law, up to the date of its confirmation, and depended on the political power. The plaintiff's assumption comes only to this, that the United States erred in granting the common first, in prejudice of her better right to have the first grant. To this assumption, the answer is, that if the sovereign power wronged her, she is without remedy in a municipal court.

The second instruction given by the Circuit Court was, that the notice of claim filed with the recorder and exhibited to the board was evidence of the extent of said claim to commons. The competency of the evidence was not objected to on part of the plaintiff; it was such as she herself resorted to, for the establishment of the extent and boundary of her own claim, and, aside from the legal and official survey of the commons made in 1832, is the only evidence of boundary that is likely to exist at no distant future day, and was the usual evidence introduced to prove the fact before the survey of 1832 was made. The court gave no opinion on its effect, but properly left it to the jury.

The third instruction is, that if the jury believed the land in dispute to lie within the bounds of the common confirmed by the acts of 1812 and 1831, then they should find for the defendant.

The first consideration on this instruction arises on the act of July 4th, 1836, by which the plaintiff's claim was confirmed. The fact, that claims embraced by the act interfered with lands

Les Bois v. Bramell.

previously granted or sold by the United States, was well known to the commissioners, and in their report of 27th November, 1833 (5 D. Green's State Papers, 702), they state for the information of Congress, that "there are numerous cases of lands lying within these French and Spanish claims belonging to individuals whose right or claim originated under the government of the United States; some depend on purchases; some on the law allowing pre-emptions; some others on New Madrid locations; and some again upon settlement rights which have been confirmed; — that most of these persons have been for a long time settled on their lands; their claims being of a *bonâ fide* character, derived from the government of the United States, they went on to improve their lands, making for themselves and families comfortable homes, without any belief that they would ever be interrupted in their possessions; that should the claims reported by the board be confirmed by Congress, in whole or in part, Congress will, in their wisdom, no doubt notice the suggestions here made, and carve out such a course as will quiet the uneasiness and anxiety which are felt, by doing every thing which even the most scrupulous demands of justice could require."

In view of this report, Congress passed the aforesaid confirmatory act, which declares, — "That if it shall be found that any tract or tracts confirmed as aforesaid, or any part thereof, had been previously located by any other person or persons, under any law of the United States, or had been surveyed and sold by the United States, this act shall confer no title to such lands in opposition to the rights acquired by such location or purchase; but the individual or individuals whose claims are hereby confirmed shall be permitted to locate so much thereof as interferes with such location or purchase on other lands of the United States," &c.

The officers of the government administering the land department had to construe this law with its exceptions; the matter was referred to the Attorney-General, and in September, 1842, he gave it as his opinion, that the confirmations must yield to prior confirmations; school sections, ordinary sales prior to the act of July 4th, 1836, &c.

A confirmation of a Spanish or French claim, either by a board of commissioners under the act of 1807, or by Congress directly, or by the District Courts by force of the act of 1824, is a location of land by a law of the United States; surveys have been made and patents issued for such land in the great majority of instances, and it cannot be questioned, as we think, that a title thus protected by patent was intended to be carved out of the act of 1836; nor is it perceived how the St. Louis common can be in a worse condition, as the acts of 1812 and 1831 did not contemplate any further grant than the acts themselves import, and this conclusion is greatly strengthened by the following considerations.

The plaintiff's claim, and all others of a similar character within

the St. Louis common, that is, such as the board of commissioners from 1806 to 1812 had examined and rejected, were well known to Congress when the act of that year, confirming the common, was passed ; the report of the board had just then been returned to Congress, and Mr. Penrose, one of its members, and Mr. Reddick, the clerk, were at Washington, as appears by their letters. The two of Mr. Penrose were communicated to the House of Representatives, and that of Mr. Reddick to the chairman of the committee of public lands (2 American State Papers, 447 – 451) ; they gave the information on which Congress proceeded in acting on the report, as the letters plainly show. The same information was part of the public and printed documents of Congress when the second confirming act of 1831 was passed ; and when it was known, Spanish and French pretensions to claim conflicting with the common stood barred. In 1832, the common was officially and legally surveyed, pursuant to the act of May 26th, 1824, and the survey stood recorded in due form in 1836, when the plaintiff got her title. These laws, and the acts done by the United States in pursuance of them, we suppose, made and located the common's title as effectually as a patent could have done, and brought it within the exception of the act of 1836 ; and that the plaintiff Les Bois's confirmation was intended to give her land elsewhere, without disturbing the opposing title.

For another reason, we think the instruction was proper. When the country was acquired, the title to the land in dispute passed from France to the United States ; on this government was imposed the duty by the treaty to satisfy individual and unperfected claims. This was to be done in a due exercise of the political power, to whose justice alone the claimant could appeal, and to whose decision she was compelled to submit ; and there being two adverse claims to the same land, equally inchoate, and the government, being unable to confirm both, was under the necessity of determining between them ; and, having granted the land to one, necessarily rejected the pretension of the other to the same land ; and therefore the first grantee took the legal and exclusive title. But where there is a second confirmation, as in the instance before us, then the justice of the government must be relied on by the second grantee for compensation ; and this compensation the act of 1836 has provided. The last ground is the one on which the decision in the case of Chouteau *v.* Eckhart proceeded, in regard to the St. Charles common ; and which doctrine, we think, applies equally to the present controversy.

For the several reasons above stated, it is ordered, that the judgment of the Circuit Court be affirmed.