James D. Hill *et al. v.* John D. Boyland *et al.*

1. STATUTES OF LIMITATIONS : VALIDITY OF ACT OF AUGUST, 1861, SUSPENDING.—The act of the legislature of August, 1861, suspending the statutes of limitation, is unconstitutional.   *Coffmann* v. *Bank of Kentucky.*

2. STATUTES OF LIMITATIONS : COURTS OF EQUITY.—Courts of equity will adopt the limitation prescribed for legal remedies in analogous cases arising under their jurisdiction.   28 Miss. R. 312 ; 33 Miss. R. 155.

3. OFFICE AND OFFICERS.—The term " office " has no technical meaning distinct from its ordinary acceptation.   An office is a public charge or employment, and a public officer one who has some duty to perform concerning the public.   36 Miss. R. 273 ; Bac. Abr. 280 ; Carthew, 479.

4. OFFICE AND OFFICERS: VALIDITY OF ACTS OF " DE FACTO," AND NOT " DE JURE," PUBLIC OFFICERS.—The acts of public officers, who are acting under the color of office, by appointment or election not strictly legal, or who, being legally appointed or elected, fail to qualify themselves by the requisite tests, or who hold over after the expiration of their term of office, are, in respect to the public and third persons who have an interest in them, held valid.   2 Kent's Com. 339 ; 24 Miss. R. 421 ; 36 Miss. R. 293.

5. SAME : SAME: LEGISLATURE : FAILURE OF MEMBERS TO TAKE THE OATH PRESCRIBED BY CONSTITUTION OF UNITED STATES DOES NOT INVALIDATE THEIR ACTS.—The provision in the Constitution of the United States and of the State of Mississippi,

Hill et al. *v.* Boyland et al.

requiring members of the legislature to take an oath to support the Constitution of the United States, is merely directory, and the failure to take such an oath will not invalidate their legislation.

6. LAWS OF NATIONS: BELLIGERENT RIGHTS: NOT NECESSARY THAT BOTH NATIONS SHOULD BE INDEPENDENT.—To create belligerent rights, it is not necessary that the war should be waged between independent nations ; it is sufficient if one of the belligerents claim sovereign rights as against the other. 2 Black R. 666, 667, 669 ; Vattel's Law of Nations, page 424, 425, section 293.

7. LAW OF NATIONS : CIVIL AND INTERNATIONAL WAR: RIGHTS OF BELLIGERENT: UNITED STATES AND CONFEDERATE STATES.—The recent war between the United States and Confederate States was a civil war ; and each party to it claiming belligerent as well as sovereign rights, is to be regarded for the time as an independent nation, entitled to exercise all the rights which belong to belligerents in a public, international war. 2 Wallace's R. 419 ; Vattell, sections 293, 294, 295, pages 425, 426, 427.

8. LAW OF NATIONS : BELLIGERENT RIGHTS AS BETWEEN THE PARENT GOVERNMENT AND REVOLTED PROVINCE.—To entitle a revolted province to belligerent rights, it is not necessary that its independence should be acknowledged by the parent government. 2 Black. R. 669 ; 7 Wheat. 337.

9. LAW OF NATIONS : CONQUEROR AND CONQUERED: USAGE OF NATIONS AS TO TREATMENT OF THE CONQUERED.—The modern usage of nations in cases of conquest, is usually for the conqueror to displace the sovereign and assume dominion over the country ; the allegiance of the people is changed, their relations to each other and their rights of property remain undisturbed. 7 Peters, 86, 87 ; 1 Peters, 542 ; 12 Wheat, 438 ; 10 Peters, 720, 729, 730 ; 9 Peters, 734 ; 2 Gallison, 50 ; 1 Dodson's Adm. R. 451.

10. LAW OF NATIONS: NO NATION CAN HOLD ITS OWN TERRITORY BY RIGHT OF CONQUEST.—A nation cannot make a conquest of its own territory, and after the suppression of an assertion of sovereign rights by a portion of the people occupying its territory, it acquires no new title, but only regains the rights of which it was temporarily deprived. *Amy Warwick*, 24 Law R. 335.

11. ORDINANCE OF SECESSION OF 1861: EFFECT OF.—If the ordinance of secession, as passed by the convention of 1861, was void, it could only affect the relation of the State to the government of the United States, it could not deprive it of its existence as a State, nor change the internal municipal rights of its citizens.

12. STATUTES: VALIDITY OF THOSE ENACTED DURING THE WAR.—All acts passed by the legislature of the State of Mississippi during the war, not inconsistent with the organic law, were valid, and remained so afterwards, until altered or repealed by her authority, with the exception, that upon the return of peace, all such acts as were inconsistent with the Constitution of the United States, or the laws passed in pursuance thereof, and then existing, were thereby annulled.

13. STATUTES OF LIMITATIONS: ACT OF JANUARY, 1862: SUSPENDING, VALID.—The act of the legislature of the State of Mississippi, of the 29th January, 1862, suspending the statutes of limitation for the period therein prescribed, is valid.

14. CHANCERY PRACTICE: PARTIES: TRUSTS AND TRUSTEES.—The trustee is a necessary party to a bill filed for the purpose of enforcing the collection of notes secured

Hill et al. *v.* Boyland et al.

by deed of trust, though there may be another deed of trust of older lien and prior date, which conveys the same property to a trustee who is made a party to the bill. 1. Spencer's Eq. 706.

15. EXECUTORS AND ADMINISTRATORS: HEIRS AND DISTRIBUTEES: RIGHT TO SUE, WHEN NO DEBTS OR PERSONAL REPRESENTATIVES DISCHARGED.—The distributees have the right to sue for and recover property belonging to their ancestor, when there is no administration, and no debts due, or when there has been administration, which has been finally settled and the personal representatives discharged. 38 Miss. R. 599; 33 Miss. R. 148; 29 Miss. R. 65.

APPEAL from the Chancery Court of Yazoo county. Hon. E. G. Henry, judge.

*Miles* and *D. Jones*, for appellants.

*R. S. Holt* and *W. & J. R. Yerger*, for appellees.

HARRIS, J., delivered the opinion of the court.

Appellees filed their bill in the Chancery Court of Yazoo county, to enforce the collection of various notes secured by several deeds of trust, executed by the appellant, James D. Hill, and also several deeds of trust executed to different trustees, defendants hereto, by H. R. W. Hill in his lifetime, the father of the said James D. Hill. The bill shows that the lands and other property embraced in the trust deed (marked Exhibit D) were devised to the defendant, James D. Hill, who was his sole child and heir-at-law, who received the same from the executor under his father's will.

To this bill the appellant, James D. Hill, filed the plea of the statute of limitations, as to the three notes for $10,000 each, and as to one note for $30,000, all of which became due and payable on the 1st day of December, 1856; and demurred to the relief sought as to the other notes and deeds of trust.

The defendants Miles, Irby, Hancock, Black, Price and Moss, filed demurrers, and the defendant, John H. Boyland, filed his answer, asserting claim to a share in said notes or their proceeds.

The court below held the plea of Hill insufficient, and overruled all the demurrers, and this appeal is prosecuted to revise this action of the court below, which is assigned for error.

It is insisted by counsel for appellants that inasmuch as nine years have elapsed from the date of the maturity of the four notes mentioned in the plea, they are barred by the statute of limitations (Rev. Code, chapter 57, § 1, art. 4, and § 2, art. 5), *unless* the legislation of this State, in 1861 and 1862, suspended that statute.

The act of 1861, having been declared unconstitutional by the decision of this court in the case of *Coffman* v. *The Bank of Kentucky* (not yet reported), it is admitted, cannot have this effect.

But it is insisted that the act of the 29th of January, 1862, passed "to suspend for a limited time *certain parts* of the statute of limitations," is equally ineffectual to suspend the operation of the statute of limitations *in this form of proceeding ;* that this is not its purport, but in express terms it purports to suspend only *certain parts* of that statute, to wit : " All acts limiting the time for the commencement of *actions* on bonds, promissory notes, bills of exchange, open accounts, or other contracts for the payment of money ; all acts limiting judgment liens and the time for issuing executions, and all acts limiting the time for commencing suits to enforce mechanics' liens ; " that the term *action* has reference alone to courts of common law; and the right to proceed in equity to enforce trusts and foreclose mortgages, remains unimpaired. That this view is confirmed by the subsequent act of the 31st December, 1862, suspending all acts limiting the time for the commencement of any " *civil action or proceeding* " in *any court* in this State until twelve months after the close of the war. For that, this last act was nugatory, if the former act included " proceedings " in chancery.

Hence it is insisted that the four notes due and payable on the 1st of December, 1856, were barred on the 1st day of December, 1862, thirty days prior to the passage of the act last above referred to.

If it were admitted that *in. terms* the act of the 29th December, 1862, only embraced *actions at law*, this result would not follow. Courts of equity, from the commencement of their jurisdiction, and before any positive enactments for the limita-

tions of actions at law, have invariably discountenanced laches and neglect. And from the period when proceedings at law were subjected to particular limitations, courts of chancery have, with striking uniformity, applied them to similar cases within their jurisdiction.

Even when there was no analogous statutory bar they refused relief to *Stale demands* where the party had slept upon his rights. And after a statutory bar was affixed to the *legal* remedy, the remedy in a court of equity in analogous cases has been confined to the same period. Indeed, both in the English and American courts, this principle has been so long and so firmly settled that it has grown into a maxim that " equity follows the law ; " and nothing but an express declaration of the legislative will could have the effect of changing this long course of judicial decision. Whether, therefore, the *terms* of the act in question embrace courts of equity or not, the principles upon which they have always acted in applying statutes of limitation, as well as a just regard for uniformity in the rules governing the rights of parties, require adherence to these doctrines until they shall be altered by express legislation.

In the case of *Mandevelle et al.* v. *Lane,* 28 Miss. R. page 312, and also in the case of *Goffe* v. *Robins,* 33 Miss. page 155, decided by this court, the question has been settled " that courts of equity will adopt the spirit and substance of the limitation in cases of an analogous character, coming under their jurisdiction, and apply the principle of the statute and the period thereby created to such cases."

So that at the time the act in question was passed, the legislature must be presumed to have understood well not only these decisions of our own court, but also the practice of courts of equity and the manner in which they had previously conformed their action to the limitations prescribed for *actions* in courts of law, without any direct legislative requirement.

This knowledge, and the omission in the act of 29th December, 1862, to make any express exceptions in favor of suits in equity, in themselves, create a strong presumption of an *intention* on the part of the legislature that courts of equity should

continue on this subject their ancient rule—*Equitas sequitur legem.*

It is next insisted on behalf of the appellants that the entire legislation of this State, attempting to suspend the statute of limitations, is void.

It is said that in order to pass valid laws, the legislature must be a valid and legal body, and must assemble and act under and in harmony with the paramount law of the land; that before the passage of the act attempting to suspend the statute of limitations (in January, 1861,) Mississippi, by an ordinance of her convention, attempted to withdraw from the Union, and shortly thereafter became one of the " Confederate States,"· an enemy in hostility to the United States; that, by unsuccessful revolution, " she is remitted back to her *status ante bellum*, all acts done by her during the war being null; that, failing to create a new government *de jure*, and having no government *de facto, established and recognized*, she must be considered as having all along constituted one of the United States, notwithstanding her ordinance of secession; that, in addition to this, by her ordinance of August, 1865, the convention of Mississippi declared the ordinance of secession null and void.

It is insisted further that the State of Mississippi has never been able to legislate lawfully and constitutionally " except as one of the United States." That by the constitution of the United States, as well as the Constitution of this State, the members of the legislature were bound to take an oath to support the constitution of the United States; and that by the State constitution " *before* " they entered upon their duties, they were bound to swear to support both constitutions. That the convention of 1861, by the ordinance of secession, abrogated this oath and substituted a hostile one; and hence it is argued that the legislature, after that ordinance, organizing in " hostility to the organic law," could pass no valid act. That Mississippi did not cease to be a sovereign State, as she had always been " as one of the United States, in spite of her ordinance of secession." In that character only could she legislate lawfully, when acting in conformity with, and in subordination to, the Constitution of

the United States, as well as her own constitution; and failing to take the oath required by both constitutions, and taking *another* and hostile oath, substituted for it, her legislature could pass no valid act.

And so it is admitted, in the brief of counsel for appellant, that Mississippi continued to be " one of the United States," in spite of her ordinance of secession.

That the acts of a government *de facto* are valid, as are the acts of an officer *de facto*, provided possession, and color of office or right, accompany and coëxist with their action.

That the acts of a usurper, in possession of the government under color of right, must be respected and obeyed.

That if the government of Mississippi had been a government *de facto*, all her acts and engagements would be binding on her present government; and neither the laws, nor constitution, nor public policy of the United States government, could have had effect within her limits, during that period, and her acts as such government *de facto* would have been binding on all the world.

The grounds relied on in this argument, to establish the illegal character of the body claiming to exercise legislative power in the State of Mississippi after the adoption of her secession ordinance, are, first, that they failed to take the oath required by the Constitution of the United States, as well as the constitution of Mississippi, as it existed prior to the ordinance of secession. And, second, that it was a body claiming to act in hostility to the government of the United States.

As to the first ground: The members of the legislature, whose acts are in question, were lawfully elected as such by their respective counties, under the provisions of their Constitution, and according to laws which had undergone no change; and they became entitled to assemble themselves as the representatives of the people, at their capitol, for the purpose of entering on the discharge of the duties of the office to which they had been so elected. When assembled, by the provisions of that same constitution which had existed since 1833, it is declared that " *each house* shall judge of the qualifications and elections

its own members." Rev. Code, page 27, section 15. This right of judgment was exclusive of all other tribunals, from which there is no appeal provided. The requisites and manner of qualification and election, were, therefore, questions for the judgment of each house, and their judgments, when pronounced, conclusive.

But independent of this, upon general principles, as well as by the express provisions of our laws (Rev. Code, page 138, article 194) : "The official acts of any person in possession of any public office, and exercising the functions thereof, are valid and binding as lawful official acts, in regard to all persons intrusted therein or affected thereby, whether such person be lawfully entitled to hold such office or not, and whether such person be lawfully qualified or not; but such person is liable to all the penalties imposed by law for usurping, or unlawfully holding, such office, or exercising the functions thereof, without lawful right, or without being qualified according to law.

In the case of Alcom v. Shelby, 36 Miss. R., page 273, it is held by this court that the term " office " has no legal or technical meaning attached to it distinct from its ordinary acceptation. An office is a public charge or employment. ` * * * * A public officer is one who has some duty to perform concerning the public. 7 Bac. Abr. 280 ; Carthew, 479.

And it may be stated as universally true, that where an employment or duty is a continuing one, which is defined by rules prescribed by law, and not by contract, such a charge or employment is an office, and the person who performs it is an officer.

This was the rule applied by Chief-Justice Marshall, in the case of the United States v. Maurin, 2 Brock. R. 102.

The members of the legislature were then public officers, deriving their rights and powers from their election under the organized government, which they assembled to administer.

Chancellor Kent, vol. 2, page 339, says, that in case of public officers, who are such de facto, acting under color of office, by an election or appointment not strictly legal, or without having qualified themselves by the requisite tests, or by holding over after the period prescribed for a new appointment, as in the case of sheriff, constables, etc., their acts in respect to the public

40

and third persons who have an interest in them, are held valid, in order to prevent a failure of justice.

This is the doctrine of the common law, and it is the doctrine recognized by the courts of the Confederacy. *Alcom* v. *Shelby*, 36 Miss., page 293, and numerous cases cited.

In the case of *Rhodes* v. *McDonald*, 24 Miss. R., page 421, in a suit brought on a note made by Rhodes and others, payable to Prewett as president of the board of trustees of a sixteenth section—where neither Prewett nor the trustees, his successors, in whose name the suit was brought, had given bond or taken the oath required by the laws of Mississippi — the Chief-Justice, delivering the opinion of the court, says : The statute directs that the trustees of school lands, *before* they or either of them proceed to the discharge of the duties required of them, shall enter into bond with such security as may be required of them by the board of county police of the county in which they may reside, payable to the president of said board of county police, and his successors in office, conditional for the faithful discharge of the duties required of them by the act ; and said bond shall be in such penalty as such board of county police shall direct ; and said trustees shall also take an oath before said board of county police, that they will discharge their duties as such trustees according to law, to the best of their skill and judgment. *This language is merely directory.* It does not declare that the acts performed by the trustees in the discharge of their proper functions shall be *void*, unless they shall *previously* enter into bond and take the required oath. He says the rule is too well settled to be questioned—that the acts of one who comes into office by color of title, in the discharge of the duties of that office, are valid, and the rule applies to the case then before him. He adds : The trustees of school lands are elected by the heads of families who are qualified voters, resident in the respective townships. They hold their office by virtue of the election, and when duly elected, they are in office by something more than color of title. The statute does not declare their acts void, if they do not give bond and take the oath ; much less does it reach their office,

unless their acts are performed. It would be absurd to say that under such circumstances, they remain officers, and yet their acts as such are void.

In the case before us neither by the Constitution of the United States, nor by the constitution of Mississippi, were the acts of members of the legislature made void, for a failure to take the prescribed oath. The provisions here relied on, were, therefore, merely directory, and the omission to take the oath does not affect the validity of their legislation.

II. But it is urged by counsel for the appellants, that the legislative body was one claiming to act in hostility to the government of the United States, and that its authority has been overthrown, and its government subdued by force of arms, and, therefore, its action during the hostility and ever since, until permitted by the United States Government, is void.

Neither the interests of the United States Government, nor justice to the State, nor any sound public policy, could be promoted by holding, contrary to the fact, that the citizens of this State were in a state of anarchy *among themselves*, without rights, *without* laws, constitution, or government, for the regulation of their private, internal, local affairs, during the progress of the war. That the ordinances, legislative acts, or other proceedings of the State, conflicting with the Constitution and laws of the United States, should be abrogated, and that every impediment to a restoration of peace and harmony, under the old government, should be removed, is not only the right of those who triumphed in the war, but its legitimate result. But the proposition, that the citizens, who owed at least temporary allegiance to the government which possessed their property, and controlled by its power their persons, during the period of such dominion, were remanded to a state of nature as barbarians and outlaws—in all their relations with each other, civil as well as criminal—as a judicial question, seems to us neither sanctioned by the principles of international law, recognized by our highest judicial tribunals, nor by any code of morality known to civilized nations. To mitigate the hardships of war, and humanize the conduct of nations, in all its

consequences, has been the great end constantly kept in view by the laws of nations. To regard these great questions, growing out of the war, with the spirit and temper of crimination, recrimination, and revenge, would be as unbecoming the parties as it would be destructive of the ends of justice, and subversive of the principles of morality and humanity which lie at the foundation of all laws, whether municipal or international.

That protection and allegiance are mutual and reciprocal rights and duties between government and people, in their nature inseparable, is universally admitted. When the power of protection ceases, the duty of allegiance, its correlative, must cease with it. In a state of war, therefore, the citizen being compelled to submit for the time to the party having the possession and control of the territory in which he resides, he becomes subject to its dominion, his property and his person are governed by its laws, and without regard to the international strife, his *private rights*, under the municipal laws to which he is thus subjected, must remain the same, no matter what may be the result of the struggle. His personal feelings and opinions are merged in his territorial *status*, and belonging to " enemy territory " he is to be regarded and treated by the opposite power as an enemy, without the jurisdiction of its courts, and beyond the power or protection of its laws. The subsequent resumption of authority by the former sovereign cannot change the character of *past transactions*, or deprive the citizen of rights vested under the laws of the territory while it was permanently *possessed* and *governed* by the enemy as their territory.

The existence of a civil war during the late contest, we need not undertake to discuss. It is settled as such by the admission and decision of all the departments of the United States Government. In the prize cases, 2 Black's R. S. C. of the U. S., page 667, Justice Grier delivering the opinion of the court, says: " A civil war is a fact in our domestic history which the court is bound to know."

Both parties need not be independent nations; a war may exist where one of the belligerents claims sovereign rights, as against the other. Id., page 666.

And in this case, as well as Mrs. Alexander's cotton case, 2 Wallace's R., page 419, it is distinctly held, in relation to *this war, that it was a civil war, governed by the principles of public law, so often announced from that bench as applicable to civil and international wars.*

Being a civil war, each party claiming *belligerent as well as sovereign rights* is to be regarded for the time as an independent nation, entitled to exercise all the rights which belong to belligerents in a public international war. Vattel's Law of Nations, sections 293, 294, 295, pages 425, 426, 427.

"When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have engaged in hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war." Justice Nelson, 2 Black's R. S. C. U. S., pages 666, 667.

A civil war breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. These two parties must therefore be considered, necessarily as constituting, at least for a time, two separate bodies, two distinct societies Having no common superior to judge between them, they stand precisely in the same predicament as two nations who engage in a contest, and have recourse to arms. Vattel's Law of Nations, pages 424, 425, section 293, cited and approved by Grier, J., in 2 Black's R., page 667.

When the regular course of justice is interrupted by revolt or rebellion, or insurrection, so that the courts of justice cannot be kept open, *civil war exists*, and hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies, invading the land. 2 Black's R. 667, 668.

It is not the less a *civil war*, with *belligerent parties* in hostile array, because it may be called an insurrection by one side, and the insurgents be considered rebels, or traitors. It is not

necessary that the independence of the revolted province, or State, be acknowledged, in order to constitute it a party belligerent in a war, according to the law of nations. 2 Black, 669.

Each party in a civil war is deemed by us a *belligerent nation*, having so far as concerns us the sovereign rights of war. The *Santissima Trinidad*, 7 Wheat. R., page 337.

If the territory be in the permanent occupation of the enemy; if the enemy has established a civil and military government over it, and claims and exacts allegiance from all inhabitants; levies taxes, etc., it is *enemy's territory* beyond doubt. The *Guasimo*, 11 Moore's Pr. Ca. 101; *United States* v. *Rice*, 4 Wheat. 246; and in the last case cited, the possession of the British government was only for *five months*.

In the prize cases, Justice Grier, delivering the opinion of the court, after saying that it is a proposition, never doubted, that the *belligerent party who claims to be sovereign may exercise both belligerent and sovereign rights*, and citing 4 Cr., page 272, says: Under the peculiar constitution of this government, although the citizens owe supreme allegiance to the Federal Government, they owe also a qualified allegiance to the State in which they are domiciled. Their persons and property are subject to its laws.

Hence, in organizing the rebellion, *they have acted as States, claiming to be sovereign over all persons and property within their respective limits*, and asserting a right to absolve their citizens from their allegiance to the Federal Government. Several of these States have combined to form a new confederacy, claiming to be acknowleged by the world as a sovereign State. Their right to do so is now being decided by wager of battle. The ports and territory of each of these States are held in hostility to the general government. It is *no loose or unorganized insurrection*, having no defined boundary or possession. *It has a boundary marked by lines of bayonets, and which can be crossed only by force.* South of this line is " enemy's territory," *because it is claimed and held in possession by an organized, hostile and belligerent power.* All persons residing within this territory,

whose property may be used to increase the revenues of the hostile power, are, in this contest, liable to be treated as enemies, *though not foreigners.* They have cast off their allegiance and made war on their government, and are none the less enemies, because they are traitors." Prize Cases, 2 Black's R., pages 673, 674.

It was therefore not the territory of the United States during the existence of this state of things, but "enemy territory." And it was so held by Chief-Justice Chase in Mrs. Alexander's cotton case, and for that reason her cotton condemned as prize of war.

In delivering the opinion of the court Chief-Justice Chase, treating of the question, whether Mrs. Alexander's plantation, where the cotton was taken by the Union troops, was "enemy's territory," after stating the fact, that the duration of the military occupation of that territory by General Banks, was measured by the time required for the advance and retreat of the army and navy, says: There can be no doubt, we think, that it was "enemy's property." The military occupation of the national forces was too limited, too imperfect, too brief, and too precarious, to change the "enemy" relation, created for the country and its inhabitants, by *three years* of continuous rebellion, interrupted at best for a few weeks, but immediately renewed and ever since maintained. 2 Wallace's R., page 418.

Before the war, then, Mississippi was a State, entitled, *at least,* to the "qualified allegiance" of her citizens; and *certainly*—except so far as limited by the Constitution of the United States—her sovereignty and right to allegiance were *unqualified and unlimited;* because on the same footing with the old States, before they entered into the compact creating the Federal Union. By the terms of her admission into that Union, she was admitted "upon the same footing with the original States, *in all respects, whatever.*" The original States were sovereign and independent States before the compact of Union was formed; so declared by themselves—so acknowledged by Great Britain after the war of the revolution. And *as such, they organized* the Federal Union, granting to it *certain powers,* and reserving

to themselves the great mass of original sovereignty, rights and power, which belonged to them before that compact of Union. The States made the general government, and not it the States. They created it by virtue of their inherent sovereignty and power as independent States, and invested it with *all* the power that lawfully belongs to it.    They did not derive their independence, sovereignty, or any other power, or authority of government from it.    It never existed until after the sovereignty and independence of the respective States, who subsequently formed it, had been separately acknowledged by the government of Great Britain.    Their separate existence as States, was never merged, or destroyed, nor their right of self-government impaired, except to the extent and during the continuance of the restraints imposed by themselves, in the Constitution of the United States. Whether therefore the act of secession was valid or void, it could only affect the relation of the State and its citizens towards the United States Government, and could not deprive it of its existence as a State, or divest its citizens of their internal municipal rights, as between themselves; the assertion of their belief in the existence of such a right, and their attempt to exercise it *in law*, can have no such effect.

The Supreme Court of the United States have decided, " That in organizing the rebellion," Mississippi " acted as a State," claiming to be sovereign, over all persons and property within her limits.    She held her territory, at the time of the passage of the act in question, in hostility to the United States Government.    " It was not a loose, unorganized insurrection, by a part of her people, having no defended boundary or possession," but she " had a boundary marked by lines of bayonets, which could be crossed only by force."    She had a possession, exclusive, and persistently maintained *for years*, by the power of her organization, instead of for five months, as in the case of the island of Castine.

Her territory, then, was not for the time a part of the United States, but, over it, the constitutional powers of the United States Government had been suspended by force of arms, and it was therefore " enemy territory " in legal contemplation; where

Hill et al. *v.* Boyland et al.

neither the person nor property of a loyal citizen of the United States, *residing there*, were entitled to the protection of her laws, or the cognizance of her courts, " because it was claimed and *held in possession* by an organized, hostile, and belligerent power." The United States Government, for the time, had neither citizens, nor courts, nor laws, nor public policy, nor constitutional authority, as a matter of fact, in Mississippi ; but her people were enemies, holding possession of her territory in hostility to the government of the United States, as decided by the Supreme Court of the United States, in the cases already referred to.

Mississippi was then originally a State *de jure*, in attempting to secede. " She acted as a sovereign state," claiming to be sovereign without limitation, and demanding the *unqualified* allegiance of her citizens ; and for years after the passage of the act in question, she maintained, by force of arms, the claim she asserted.

In the case of *Swan* v. *Buck*, not yet reported, in speaking of the obligation of the State to pay the salaries of its civil officers, for services during the war, the court has said " that the State of Mississippi is to-day the same State that occupied its limits before the 9th day of January, 1861, and since that date. Its constitution and its laws, are the same except so far as they have been altered from time to time by its own act; rights of property are to be governed, contracts are to be construed, and crimes are to be tried and punished, by the same laws that existed before the date of the act of secession, or that have been enacted since. It is not a new State or a new Government, but the same State and the same Government. * * The State is not relieved of its debts by the revolution through which it has passed, and the salaries due to its officers for the period during the war, while they were in the discharge of their functions, stand upon no less favorable footing than other debts before the war commenced, or contracted since."

In the case of the *United States* v. *Percheman*, 7 Peters' R., pages 86, 87, Chief-Justice Marshall, delivering the opinion of the court, says " that it is very unusual, even in cases of conquest, for the conquerer to do more than displace the sovereign, and

assume dominion over the country. The modern usage of nations, *which has become law*, would be violated, that sense of justice and right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be confiscated, and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but *their relations to each other, and their rights of property, remain undisturbed.*"

In the *American Insurance Co.* v. *Canter*, 1 Peters' R., page 542, the same learned judge had said, that the usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master may impose. On such transfer of territory, *it has never been held that the relations of the inhabitants with each other undergo any change.* Their relations with their former sovereign are dissolved, and new relations are created between them and the government which has acquired their territory. The same act which transfers their country, transfers the allegiance of those who remain in it; and the *law* which may be denominated *political*, is necessarily changed, although *that which regulates the intercourse and general conduct of individuals, remains in force*, until altered by the newly created power of the State.

The same principles are recognized in *Strother* v. *Lucas*, 12 Wheat. 438; 10 Peters, pages 720, 729, 730, and *Mitchel* v. *United States*, 9 Peters, 734.

Indeed, the rules of international law, like the principles of the municipal law, whether in case of conquest or surrender by treaty, regard the title, dominion, and national character of the country as still in the old possessor, until a *change of possession* by actual transfer.

The national character of a place, agreed to be surrendered by treaty, but not actually transferred, continues as it was under

the character of the ceding country. To complete the right of property, the right to the thing and the possession of the thing should be united. The *Fama*, 5 C. Robinson's Adm. R. 109.

In such case full sovereignty cannot be held to have passed, by the mere words of the treaty, without actual delivery. 1 Kent's Com., page 180, and notes and authorities cited; Phillimore on International law, 3d volume, page 469.

In the case of the *United States* v. *Hayward*, 2 Gallison's R., page 500, which was a writ of error from the District Court of Massachusetts to the Circuit Court of the United States, upon information *in rem* against goods seized upon land for an alleged illegal importation into the United States, Judge Story says : The second objection is, that the court directed the jury that Castine was under the circumstances a foreign port. By "*foreign port*," as the terms are here used, may be understood a port within the dominions of a foreign sovereign—without the dominions of the United States. The port of Castine is the port of entry for the district of Penobscot, and is within the acknowledged territory of the United States. But at the time referred to in the bill of exceptions, it had been captured, and was in the open and exclusive possession of the enemy. By the conquest and occupation of Castine, that territory passed under the allegiance and sovereignty of the enemy. 1 Dodson's Adm. R., page 451. The sovereignty of the United States over the territory was of course suspended, and the laws of the United States could no longer be rightfully enforced, or be obligatory upon the inhabitants who remained and submitted to the conquerors. Castine, therefore, could not, strictly speaking, be deemed a port of the United States, for its sovereignty no longer extended over the place; and it was further his opinion, that so far as respects the obligatory force of the laws of the United States, it was to be considered a "foreign port" or a port "*extra ligo antiam reipublicæ*."

In the case of the *United States* v. *Rice*, the same distinguished jurist, delivering the opinion of the Supreme Court of the United States in another case, arising under the occupation of the same port, by the British forces, for about five months, in

1814 and 1815, says: "During this period, the British Government exercised all civil and military authority over the place, and established a custom house, and admitted goods to be imported according to regulations prescribed by itself, and among others admitted the goods upon which duties are now demanded. These goods remained at Castine, until after it was evacuated by the enemy; and upon the reëstablishment of the American government, the collector of the customs, claiming a right to American duties on the goods, took the bond in question for the security of them.

"Under these circumstances we are all of opinion that the claims for duties cannot be sustained. By the conquest and military occupation of Castine, the enemy acquired *that firm possession*, which enabled him to exercise *the fullest rights of sovereignty* over that place. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could be no longer rightfully enforced there, or be obligatory upon the inhabitants, who remained and submitted to the conquerors. By the surrender, the inhabitants passed under a temporary allegiance to the British Government, and *were bound* by such laws, and *such only*, as it chose to recognize and impose. From the nature of the case no other laws could be obligatory upon them; for where there is no protection, or allegiance, or sovereignty, there can be no claim to obedience. Castine was, therefore, during this period, so far as respected our revenue laws, to be deemed a foreign port; and goods imported into it by the inhabitants, were subject to such duties only as the British Government chose to require. Such goods were in no correct sense imported into the United States. The subsequent evacuation by the enemy and resumption of authority by the United States, did not and could not change the character of the previous transactions. The doctrines respecting the *jus postliminii* are wholly inapplicable to the case. The goods were liable, when imported, to American duties, or not at all. That they were not so liable at the time of importation is clear, from what has already been stated: and when, upon the return of peace, the jurisdiction

of the United States was reässumed, they were in the same predicament as they would have been if Castine had been a foreign territory ceded by treaty to the United States, and the goods had been previously imported there. In the latter case, there would have been no pretence to say that American duties could be demanded, and, upon principles of public or municipal law, the cases are not distinguishable. The authorities cited at the bar would, if there were any doubt, be decisive of the question; but we think it too clear to require any aid from authority."

Admitting then that the act of secession was a nullity, the State of Mississippi, neither in fact nor in legal contemplation, could be annihilated by a void ordinance. The attempt to change her relations towards the United States Government only involved her external relations. Within her limits there remained a regularly organized government *de jure*, as well as *de facto*, which was never disputed. The United States Government never claimed the right to regulate or control her internal or domestic affairs, not in violation of some prohibition of the Constitution of the United States; and Chief-Justice Marshall, in the case of the *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, in reply to the argument that the prohibition in the constitution " to pass any law impairing the obligation of contracts," taken in its broadest sense, would comprehend the political relations between the government and its citizens; would extend to officers within a State for State purposes; * * * would be an unprofitable and vexatious interference with the actual concerns of a State; would unnecessarily and unwisely embarrass its legislation; would render immutable those civil institutions which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances, says:

" The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to restrain the States in the regulation of their civil institutions adopted for internal government, and that *the instrument they have given us is not to be so construed,* may be admitted."

It was never claimed or insisted, that the government of Mississippi was usurped, or not rightful. No other power ever assumed the right to administer the powers of government within her limits, or disputed her right to exercise those powers as she had previously done, in subordination only to the Constitution of the United States as the supreme law of the land. Her existence *as a State* was never the subject of controversy. But her relation to the other States of the Union, her right to dissolve that relation and form a new compact with other States, was the disputed question.

If, then, her ordinance of secession was void, this could no more affect her government or her sovereignty, *as a State in the Union*, than if it had never existed. If a nullity, it surely in law could not amount to political suicide. If she had ordained her own dissolution, instead of a dissolution of her external relations to the government of the United States, there would have been more plausibility in the idea that her government had been annihilated; but in the continued exercise of all the powers of government over her own citizens, and, in her own limits, her legislative, executive, and judicial departments, with all other civil officers, in the daily discharge of their duties and functions, how or when did she lose her existence as a State? Or why should her legislative acts, not in contravention of the Constitution of the United States, or of her own constitution, be invalid? The government of the United States not only never claimed the right to deprive her of those powers, but, throughout the struggle, professed to labor for the preservation and protection of her people *as a State* in the old Union, and thereby to prevent the disruption of that Union.

If Mississippi was not a government *rightfully* and in fact, who else sought, or claimed, or possessed the powers of government, which were in fact regularly administered over her people? Can it be, that without even a claimant to dispute her right, her legislative acts, not forbidden by any organic law, are void, for want of governmental power to pass them, and this because of a void ordinance passed by her people in convention? Because the government of the United States detained Missis-

sippi in the Union by coercion of arms, to prevent its own dissolution, it does not follow that Mississippi thereby became extinct as a State, and the Union dissolved. Nor can it be true that the old Union was preserved, and yet that eleven States have been destroyed in the effort.

In legal effect, the character of Mississippi as a State in the Union was therefore established and not destroyed by the events of the war, and the act in question remains unaffected by its political results.

And this would be the result even if Mississippi had been a foreign State. The rules of international law, already stated in the cases above cited, show that even where the territory of a State or nation, in whole or in part, is conquered by, or ceded to, or united by treaty with, another nation, the municipal laws of the conquered, ceded, or united territory or nation, remain in full force until legally changed by the legislative power of the acquiring nation, agreeably to its elementary law and constitution. Gardener's Institutes of American International Law, page 53, section 13, and numerous cases, English and American, there cited; Sedgwick on Statutory and Constitutional Law, page 84, and cases cited.

So in *Strother* v. *Lucas*, 12 Peters' R., page 436, the Supreme Court of the United States say, that by the law of nations, the municipal laws of a ceded or *conquered* country, existing at the time of cession or *conquest*, continue in force until altered by the new sovereign.

But " the belligerent right of the United States Government, growing out of the suppression of the rebellion, does not confer on it *the right of conquest* after the suppression. No nation can make a *conquest* of its own territory. It acquires no new title, but only regains the possession, of which it was temporarily deprived." Justice Sprague in the *Amy Warwick*, U. S. District Court for Massachussetts, 24 Law R. 335.

The ordinance of the convention of August, 1865, was not necessary to give validity to the act in question. Nor can it be inferred from their action, taken in connection with their debates on that subject, that such was their opinion. The ordi-

nance appears to have been passed out of abundant caution, lest the dogma assumed by the President, in his proclamation appointing a provisional governor—that the State had become deprived of civil government—might be recognized, and the acts of the State government declared void.

We think it results from the foregoing views, necessarily:

1. That the provision in the Constitution of the United States, as well as the State of Mississippi, requiring members of the legislature to take an oath to support the Constitution of the United States, is merely directory, and the failure to take such oath will not invalidate their action.

2. That all acts passed by the legislature of Mississippi during the war, not inconsistent with her organic law, were valid, and remained so afterwards, until altered or repealed by her authority; with the exception that, upon the return of peace, all such acts as were inconsistent with the Constitution of the United States, or the laws passed in pursuance thereof, and *then existing*, were thereby annulled.

But it is insisted that the court had no jurisdiction. That to give the court jurisdiction, suit must be brought, either in the county where the property is situated, or where the defendant or some necessary party defendant "may reside or be found." Rev. Code, 541, article 6; Story's Eq. Pl., sections 72, 76.

This suit is brought in Yazoo county; the property is situated in Isaquena county; service was executed on John S. Boyland, who resides in Yazoo county, and on William R. Miles, who was found in Yazoo county: none of the other defendants residing or being found there.

That William R. Miles is a necessary party, we think results from his relation of trustee, in whom is vested the legal title. 2 Spence's Eq. Ju. 706.

It is no answer to this position, to say that the same legal title is also vested in another, under another deed of older lien and prior date, who is made party defendant to the bill.

So far as the bill seeks to enforce the collection of the notes secured by the deed of trust to him as trustee, he is the holder of the legal title, and a necessary party. In the event that the

defendant should show in his defense, that the prior deeds have been satisfied, and the title, originally conveyed to the trustees therein, extinguished, this defendant would be the only holder of the legal title.   Indeed, the several trustees, under their deeds of trust, are only the holders of the legal title, for the purposes severally expressed in their respective deeds.   In a bill like this, therefore, to subject the *whole* trust property to the payment of *all* the debts secured by one decree, they must each be regarded as severally invested with the legal title conveyed to them, for the purpose of the decree and sale.   As the Court of Chancery is but executing by one act the powers vested in the trustees severally, by the contracts of the parties, and as no one of the trustees, no matter what the date or priorty of his title, would have the power to sell the trust property, for the payment of the debts not secured by the conveyance to him, all must be made parties, that the court may have jurisdiction of all, and possess itself of the power of all, to execute the several trusts.

We think, therefore, this ground of demurrer was properly overruled.

The last ground insisted on by the demurrer is, that the complainants do not show by their bill a sufficient interest in the subject-matter of controversy to entitle them to maintain this bill.

The complainants claim as residuary legatees under the will of William Boyland, their ancestor.   The record shows that George W. Mordecai, of North Carolina, qualified in that State as executor of said will, and charges that he has paid all the debts and legacies in that State, but that he has not made a final settlement of his executorship.   The bill further shows that Henry Vaughn, of Mississippi, qualified as executor of said will in this State, paid all the debts and legacies in this State, made final settlement, and has been discharged from his trust by order of the Probate Court of Yazoo county.

There is then no administration *in this State* now existing, and none necessary except for the purpose of collecting and distributing among these complainants, or other parties to the bill who are alleged to claim an interest therein, the notes sought to be collected and distributed by this bill.   These notes were

41

never in possession of either of the executors of said estate, and never in the jurisdiction of the courts of North Carolina, or of the State of Mississippi, until since the discharge of Vaughn, the executor; but for safe-keeping were in one of the West India Islands during the war, and before that in New Orleans.

It does not appear from the bill and exhibits that the testator had any property in any other State except in Mississippi and North Carolina, with the exception of a house and lot in New Jersey, specifically devised to his sister Sarah Parker, and a family of negroes in the State of Tennessee, in the possession of his grandsons, Weldon E. and Alexander P. Boyland, which are specifically given to them. The will of testator, Boyland, is made an exhibit to the bill, and no mention is made in it of the notes here sought to be collected. It appears by the statements of this bill that the notes in controversy were never included in the inventories of either one of the executors; the bill charges that they never were in the possession of the executors or either of them. By article 131 of the Revised Code, page 457, besides other prerequisites, it is provided that before a foreign executor can sue in the courts of this State to recover property or debts belonging to the decedent, he must "file a certificate from the court in which the letters were granted, that the property or debts to be sued for in this State *is included in the inventory of such executor*, etc., in the court where the letters were granted; or that *he is liable there for the subject-matter of such suit.*" The bill negatives these prerequisites, so that on this demurrer it must be admitted that the notes in question cannot be collected here, by the executor who qualified in North Carolina. Under this state of facts the case seems to be fully covered by the *principles* settled in several cases heretofore adjudicated in this court.

Where there are no debts, or where the debts have all been paid, and where there is no necessity for an administration except for the benefit of the complainants, their right as heirs and distributees to sue in their own names is well settled. *Moody* v. *Harper*, 38 Miss., page 599.

In *Manly* v. *Kidd*, 33 Miss. R., page 148, it is said that it is

well settled by this court, that the distributees had the right to sue for, and recover the property when there was no administration and no debts shown.

In *Wood* v. *Ford*, 29 Miss., page 65, it is held that where no administration has been granted *in this State*, a court of chancery has jurisdiction to decree a division of the property, and an account for hire, and that the distributee is not compelled to take out administration.—Citing *Rabb* v. *Griffin*, 26 Miss. R., page 65; *Archer* v. *Jones*, 26 Miss., page 583; *Farris' heirs* v. *Graves*, 4 S. & M., page 707; *McRea* v. *Walker*, 4 How. 455.

The case is not different where there *has been* administration, which has been finally settled, and the representative of the estate discharged.

There was therefore no error in the decree of the court overruling the several demurrers on this ground.

It follows that the decree of the court below must be affirmed, the cause remanded for further proceedings, and defendants allowed sixty days to answer.