GILLIS ET AL. v. SMITH ET AL.

[75 South.   451, Division B.]

1. DEEDS.  *Validity of proof.  Burden of proof.*
In a suit by heirs of a decedent to set aside a deed by her, they
assume the burden of showing by clear and convincing testi-
mony that decedent was mentally incapacitated to execute a
deed or that the conveyance was procured by undue influence.
there being no confidential or fiduciary relationship between
the contesting parties.

2. DEEDS.  *Undue influence.  What constitutes.*
There can be no undue influence unless it is such as to take away
the free agency of the grantor, and capacity to make a deed is
implied until overthrown by evidence.

3. SAME.
Not every influence is undue and undue influence cannot be predi-
cated of any act unless free agency is destroyed; influence exerted
by means of advice, arguments, persuasion, solicitation, sugges-
tion, or entreaty is not undue unless it be so importunate and
persistent or otherwise so operate as to subdue and subordinate
the will and take away its free agency, nor is influence ordinarily
considered undue which arises out of sympathy, kindness, at-
tention, attachment or affection, gratitude for past services, de-
sire of gratifying the wishes of another, or of relieving distress,
claims of kindred and family, or other intimate personal relations,
love, esteem, social relations, prejudice or flattery.

4. DEEDS.  *Validity.  Mental capacity.*
Where the grantor in a deed had never been declared insane, had
never been treated for any mental disease, and the proof does
not show that she is a natural fool, her deed cannot be set aside
on the ground of insanity if she had sufficient mental capacity
to understand, in a reasonable manner, the nature of the particu-
lar transaction in which she was engaged and its consequences
and effects upon her rights and interest.

5. DEEDS.  *Undue influence.  What constitutes.*
Undue influence denotes something legally wrong, and influence is
undue only when it induces a transaction materially injuring
some one or is intrinsically unfair or unconscientious and to in-
duce a man to do that which he ought to do, or which ac-
cords with justice, cannot be condemned, no matter how the

influence brought to bear was acquired or how strenuously it was exerted.

6. DEEDS. *Validity. Evidence.*

In a suit to set aside a deed executed, shortly before her death by a woman, who, for years had been afflicted with paralysis, to her nephew a minor of tender years, who had lived with her from the time he was two years old, the court held that the evidence did not show mental incapacity or undue influence exerted by a sister of the grantor, in behalf of the minor.

7. DEEDS. *Validity. Evidence.*

In determining whether a grantor had capacity to execute a deed and whether the deed was induced by undue influence, the testimony of the subscribing witnesses is entitled to more weight than the testimony of those who had no such duty to perform and especially is entitled to greater weight than the testimony of witnesses who were not present at the time of executing the deed, and who did not see the grantor on the day of its execution.

8. APPEAL AND ERROR. *Review. Question of fact. Equitable actions.*

While the supreme court proceeds slowly in reversing a chancellor on the facts, yet it is charged with the duty of requiring the proof to measure up to legal standards, and if according to its view of the facts, and the promptings of conscience, the chancellor was manifestly wrong, it becomes the plain duty of that court to set aside the decree of the court below, and apply the legal test as it sees it.

APPEAL from the chancery court of Lauderdale county. HON. G. C. TANN, Chancellor.

Suit by Mrs. L. E. Smith and others against Herbert Gillis, Guardian of Jack C. Jarvis, Jr., and others. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*Currie & Smith,* for appellants.

It will be seen that the complainants in this case undertook the burden of proving, first, that Miss Susan E. Caraway executed the said deed at a time when she was "totally and wholly mentally incapacitated to executed a valid deed;" and second that the same was "procured by deception, fraud, and duress practiced

upon the said Susan E. Caraway by certain of her relatives," to wit Mrs. Nannie Peterler.

It is hardly necessary to call the court's attention to the fact that the burden rested upon the complainants to prove these allegations by a preponderance of the testimony and that the legal presumption is that the grantor in this deed was fully capacitated to make and execute the deed and that this presumption remained until overturned by evidence as above stated. See 1 Black on Rescission and Cancellation, section 253, and also section 263; *Burnett* v. *Smith,* a Mississippi case quoted in 47 So. 117, *Stanfield* v. *Johnson,* 49 So. 223.

When a court of equity is called upon to cancel and annul a solemn and formal instrument such as a deed to real estate, it is called upon to exercise one of its highest prerogatives and we submit that before granting such a request it ought to be moved to do so only upon very clear and convincing testimony.

The complainants in this case in order to secure the relief asked for, to wit: the cancellation of this deed, were by the law brought under the necessity of proving either that this grantor was wholly mentally incapacitated to execute this deed or else that she was "unduly influenced," within the meaning of the law, to execute said deed.

Before entering upon an examination of this testimony, we would like to bring to the court's attention the law with reference to "mental incapacity" and also with reference to "undue influence" so that as the testimony is gone into, we can keep before our minds the legal standards by which to weigh and measure the testimony.

Mental capacity—test of. The test of mental capacity necessary to enable a grantor to make a valid deed is that he is capable of understanding in a reasonable manner the nature and effect of the act in which he is engaged. 7 Dec. Digest, under the title of Deeds, section 68, 1 1/2; Cyc. 13-573.

Mental capacity—test of. The measure of mental capacity of a grantor is that he be capable of comprehending the condition of his property and his relation to those who are the natural object of his bounty and to reasonably understand the nature and effect of what he is doing. 7 Dec. Digest, under the title of Deeds, section 68, 1 1/2. Cyc. 13-573.

The learned author of Black on Rescission and Cancellation, which is a very late and through treatise on this subject says in section 262 in Vol. 1, that the test of mental capacity generally agreed upon is that: "A deed or contract cannot be set aside on the ground of insanity if the person had sufficient mental capacity to understand in a reasonable manner the nature of the particular transaction in which he was engaged and its consequences and effects upon his rights and interest. It is sometimes said that a person has capacity to make a deed if he has sufficient mind to be capable of transacting ordinary business affairs or of pursuing his own ordinary business in his usual manner. But this is too loose. The proper inquiry is whether he was capable of understanding and appreciating the nature and effect of the one particular act or transaction which is challenged."

Mr. Black appends an imposing array of authority to support this proposition. For two exhaustive notes setting out at length the law with reference to mental capacity, we refer the court to the case of *Slaughter* v. *Heath,* reported in 27 Vol. L. R. A. (N. S.) page 1; also the case of *MacCrellish* reported in L. R. A. (N. S.) 1915 A. however, the above quotation from Mr. Black is the most satisfactory general statement of the test of mental capacity that we have been able to find.

We will call the court's attention to the quotation from Black on Rescission and Cancellation, section 240, which is set out above, where he states that a transaction cannot be avoided on this ground unless it appears that the influence was exercised for an undue and disadvantage-

ous purpose and that influence is undue only when it induces a transaction which injures some one materially or which is intrinsically unfair or unconscientious.

In the case of *Johnson* v. *Pinckard,* reported in 72 So. 127, the Alabama Supreme Court holds that: In a suit to cancel a mortgage and deed on account of the mental incapacity of the mortgagor and grantor to execute the contracts, where complainants made no proof of such incapacity at the time of the execution of the contracts, they were not entitled to relief, since the law presumes every one sane until the contrary appears.

And we submit that this is good reasoning and sound law. Those who undertake to set aside solemn instruments on account of insanity should be required to make proof of such insanity or mental incapacity with reference directly and strictly to the instrument involved and the immediate occasion of its execution and of the circumstances surrounding its execution.

At this point, we desire to say that we are not unmindful of the rule of this honorable court, supported by a long line of decisions, that the chancellor's decree upon controverted facts will not be disturbed; and we are not asking this court to overturn, modify, or change this long established rule of the court, but our contention is that there are absolutely no facts in the complainant's case warranting the finding of the court that this lady was insane or was any ways mentally incapacitated to execute the deed in question.

Giving the fullest weight and credence and value of all of the statements of the witnesses for the complainants and the interferences to be drawn therefrom, we submit that the very most that it can be said to prove is that this grantor was mentally weak and we submit that under the law mental weakness is wholly insufficient to warrant the cancellation of an instrument. *Clarke et al.* v. *Hartt, et al.,* 47 So. 819; Page 453, L. R. A. (N. S.) 1955 A; *Ralston* v. *Turpin,* 129 U. S. 663, 32 Law Ed.

747; *Slaughter* v. *Heath, et al.,* 27 L. R. A. (N. S.) page 1.

And our own supreme court has stated in the case of *Simonton* v. *Bacon,* 49 Miss. 582: "That a mere suggestion of a weakness of intellect alone is not of itself sufficient to avoid the contract; it must be shown that the other party used some undue means to draw him into the agreement."

These quotations and citation serve to show how far short the testimony of the complinants came from meeting the legal requirements because the facts of the above quotations show that the cases under consideration there are much stronger on the facts than the case at bar, yet those courts held that the proof of such facts were not sufficient to overturn the legal presumption of sanity.

*Amis & Dunn* and *V. W. Gilbert,* for appellees.

The sole question presented by this appeal is whether or not there was testimony sufficient to warrant the chancellor in finding as a matter of fact that Miss Susan Caraway was on the fourteenth day of December, 1910, mentally incapacitated to execute the deed upon which the appellants rely. If the facts were sufficient to establish such mental defect of Miss Caraway on said date as to render her incapable of comprehending or understanding the effect of such act, the decree of the chancellor should not under the well settled rules of this court be disturbed; that is if this court cannot, from the facts disclosed by the record, say that the chancellor was manifestly wrong in reaching the conclusion that he did, the weight of the testimony was in favor of the finding of the chancellor. Those persons who were most intimately associated with Miss Caraway during the period of her last illness are practically unanimous in their testimony which is to the effect that her physical and mental state was so low as to render her in-

capable of comrehending the subject and effect of any contract which she might have. That she would recognize friends and neighbors who called to see her when she should be aroused by her mother or other attendant, is not sufficient to show such mental capacity as would render her capable of understanding the importance of a deed of the character of the one in question at page 1206, 22 Cyc., the rule of mental capacity is stated thus: "The mental defect or disease necessary to entitle one to avoid his contracts on the ground of insanity need not be so great as to dethrone his reason or as to amount to an entire want of reason, but it is sufficient if he is insane to such an extent as to be incapable of comprehending or understanding the subject of the contract and its nature and probable consequences."

The text above quoted in Cyc. is supported by the decision in *Darg* v. *Hayford,* 56 Me. 426, holding that where the sanity of the grantor of lands in controversy is in issue, the question to be decided is substantially whether at the time of the conveyance the grantor was in possession of mental capacity sufficient to transact the business with intelligence, understanding rationally what he was doing, and that less than this would not suffice to make a valid contract or conveyance.

The case of *Toalson* v. *Garner,* 15 Mo. 494, is also cited as holding that any man against whom a conveyance or contract is set up, is at liberty to show that at the time of making it he was not possessed of sufficient reason to be capable of understanding the act he was performing.

In *Simonton* v. *Bacon,* Judge SIMRALL speaking for the court uses this language: "There may be such imbecility of mind, from whatever cause induced, as *ipso facto* to incapacitate to contract." 49 Miss. 588.

The mental capacity of Miss Caraway being a question of fact and being practically the only question of fact in the case, and there being abundant testimony to support the finding of the chancellor, that her mental

capacity or unsoundness of mind at the time of executing the deed was such as to render her incapable of comprehending the effect and consequence of the deed, this court will not, as we appreciate and understand the rule, disturb the decree appealed from.

We will not protract this brief into any minute analysis of the evidence, but will say that if Miss Caraway had all the tender solicitude about the boy that appellants insist on, and had the intention and purpose to do the things she did do for him, and her mother, why did she not do it when she was up and about in her rolling chair and when there would be no question as to her capacity to execute the deed.

The facts and law of this case were presented to the chancellor in exhaustive arguments; he gave the case most painstaking consideration and we most earnestly insist that his decree should be affirmed.

STEVENS, J., delivered the opinion of the court.

Appellant Gillis is the legal guardian of the property of Jack C. Jarvis, Jr., a minor, and prosecutes this appeal from a decree of the chancery court of Lauderdale county sustaining the prayer of appellees' bill to cancel a certain deed executed by Miss Susan E. Caraway, whereby there was conveyed to the minor certain property in Meridian, Miss. Miss Caraway, now deceased, was an aunt of Jack C. Jarvis, Jr.—the sister of Jack's mother, Mrs. Nellie Jarvis. The mother of Jack died when he was about two years of age. The little boy was then taken in charge by Miss Susan E. Caraway, the grantor of the deed here brought into question, and at a time when Miss Caraway was approximately fifty-three years of age. At the time Miss Caraway took charge of the boy, she was and had for a number of years been afflicted with paralysis, being paralyzed from her hips down, and on account of this paralysis in her lower limbs she was required to spend

her days in a rolling chair by which she was moved in
and about the house. The home in Meridian was owned
by this paralytic; and Miss Caraway's mother, Mrs.
Martha Jane Caraway, a very elderly lady, was also  a
member of the household. It appears that Miss Susan
E. Caraway owned two parcels of real estate, one the
home place in Meridian, the other, some property in
Hattiesburg, Miss. The minor continued to live in the
Caraway home as a ward of Miss Caraway and the
boy's grandmother until December 30, 1910, when Miss
Caraway died. It appears that about the middle of Octo-
ber, 1910, a little more than two months prior to her
death, Miss Caraway underwent a minor operation re
ferred to as "tapping," and a quantity of fluid was
taken from her. This operation was performed by Mrs.
Castles, a woman physician of Meridian. On December
14, 1910, Miss Caraway executed a deed of convey-
ance, the original of which has been transmitted to this
court for inspection, and which deed is the subject of
attack in this suit. The deed is as follows:

"For and in consideration of love and affection, and
for the further loving and careful attention rendered by
her to me, especially during the last fifteen years of my
life, I hereby grant, bargain, sell, convey, and warrant
unto my mother, Martha Jane Caraway for the re-
mainder of her natural life the following described real
estate, to wit: Lots 13 and 14 in block 56 of and accord-
ing to Ragsdale's survey in the city of Meridan, county
of Lauderdale, and state of Mississippi. Together with
all improvements thereon. For the same consideration
hereinabove expressed,. I grant, bargain, sell, convey,
and warrant unto her the said Martha Jane Caraway,
in fee simple, lot 9 in block 5 of and according to D. D.
McInnis' First survey of the city of Hattiesburg, Mis-
sissippi. Together with all improvements thereon.

"For and in consideration of my love and affection for
my nephew, John Caraway Jarvis, whom I have reared
almost since his infancy, and who has been a great
source of aid, convenience and pleasure to me, I hereby

grant, bargain, sell, convey and warrant to the said
John Caraway Jarvis, lots 13 and 14 in block 56 of and
according to Ragsdale survey in the city of Meridian,
county of Lauderdale, and state of Mississippi. To-
gether with all improvements thereon, he to take the
said property at the death of my mother, Martha Jane
Caraway, hereinabove named with the unqualified pro-
vision that the property is to remain his, and that
he is not to sell the same before he is twenty-one years of
age, and in event he should die before becoming
twenty-one years of age, then and in that event the said
property is to revert to my heirs.

"Witness my signature this 14th day of December,
1910.                    .          SUSAN E. CARAWAY.
"State of Mississippi, County of Lauderdale.

"Personally appeared before me the undersigned
authority in and for the city of Meridian, state and
county aforesaid, Susan E. Caraway, unmarried, who
acknowledged that she signed and delivered the fore-
going instrument on the day and year therein mentioned
as her act and deed.

"Given under my hand and official seal this 14th day
of December, 1910. Wyatt Eeasterling, Notary Public
for the City of Meridian. [Impression of notarial seal
here.]"

It will be observed that Mrs. Jane Caraway, mother
of the grantor, was given a life estate in the property
in Meridian, the only property involved in this suit,
while the nephew was granted the remainder in fee with
a stipulation against the sale of the .property by little
Jack prior to his becoming twenty-one years of age.
After the death of Miss Caraway, Mrs. M. J. Caraway,
the mother, continued to reside in the home place con-
veyed by this deed until the date of her death, October
12, 1913, and during this time had full possession, con-
trol, and enjoyment of the property in accordance with
the deed. Jack C., Jr., also continued to live with his
grandmother until her death. There was no objection to
or attack made upon this deed during the lifetime of

M. J. Caraway after her death, however, Mrs. L. E.
Smith sister of the grantor and one of the appellee sherein
moved into the house left vacant by the departure of
the grandmother, and took this action it seems without
express authority from any one. At the time Mrs. Smith
moved into the house, the property of Jack C. Jarvis,
Jr., was being administered in the chancery court of
Forrest county by and through the chancery clerk of
that county. Herbert Gillis, being then clerk and guard-
ion aforesaid, was directed by the chancery court to take
charge of the real estate of the minor at Meridian and
to collect rents, etc. The guardian thereupon demanded
of Mrs. Smith rent for the use of the premises, and,
upon refusal of his demand for rents, instituted an ac-
tion in the justice court for one hundred and twenty
dollars past-due rent and recovered a judgment by de-
fault in one of the justice courts of Lauderdale county,
and thereafter a writ of garnishment was served upon
the Union Bank & Trust Company. After the filing of
this suit for rent, Mrs. S. A. Davis, another sister of
the deceased grantor, and W. B. Caraway, a brother,
joined Mrs. Smith in the filing of the bill of complaint
in this cause against Jack C. Jarvis, Jr., a minor, and
his legal guardian, and against Mrs. Nannie Peterler,
another sister, resident of Houston, Tex. The bill of
complaint charges that Miss Susan E. Caraway at the
time she executed the said deed was insane and thereby
mentally incapacitated to execute the conveyance. The
bill also charges that the deed "was procured by de-
ception, fraud, and duress practiced upon the said
Susan E. Caraway by certain of her relatives in the
interest of and for the benefit of the said Jack C. Jarvis,
Jr." In another portion of the bill it is charged "that
certain relatives, to wit, Mrs. Nannie Peterler, a sister
of the said Miss Susan E. Caraway, by over-persuasion
and undue influence, dictation, and threats procured
and cause" the execution of said conveyance. The bill
then is bottomed upon two main charges, one that the

grantor was "totally and wholly mentally incapacitated to execute a valid deed," and the other that the deed was "procured by deception, fraud, and duress," practiced by Mrs. Nannie Peterler, a sister. There was a general denial of these averments of the bill by and through the answer of appellant. Testimony was taken for both parties, and the chancellor, upon hearing sustained the bill, and canceled the deed. From this decree, appellants prosecute this appeal and asks us to reverse the decree on the law and the facts.

The cancellation of the deed in this case cannot in our judgment be upheld either upon the law or the facts. It is necessary, therefore, for us to notice somewhat in detail the testimony relied upon by the complainants in justifying the relief sought. Before analyzing the facts, it is well in this case to remember that the burden of proof is upon appellees to maintain very serious charges. The complainants assume the burden of showing by clear and convincing testimony that Miss Caraway was mentally incapacitated to execute a deed or that the conveyance was procured by undue influence. In this case there was no confidential or fiduciary relationship between the parties now contesting. Therefore:

"Primarily, the person alleging that a contract, deed, gift, or will was porcured through the exercise of undue influence has the burden of proving that fact. . . . The proof must be clear and convincing." Black on Rescission and Cancellation, vol. 1, par. 253.

The extent of the burden, the degree of proof, the true test was indicated by our court in the case of *Burnett et al.* v. *Smith*, 93 Miss. 566, 47 So. 117:

"There could have been no undue influence, unless it was such as to take away the free agency of Mr. Hartzog, and the chancellor found that such was not the case. It must be kept in mind that capacity to make the deed is implied until overthrown by evidence, and we see by reference to 29 Ency., p. 105, that not every

influence is undue, and undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted 'by means of advice, arguments, persuasions, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. Nor is influence ordinarily considered undue which arises out of sympathy, kindness, attention, attachment or affection, gratitude for past services, desire of gratifying the wishes of another or of relieving distress, claims of kindred and family or other intimate personal relations, love, esteem, social relations, prejudices, or flattery.'

"A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice."

This has been the consistent holding of our court, as shown by numerous cases which it is unnecessary here to collate. The principle is elementary and needs no citation of authority.

In reference to the charge of insanity or mental incapacity, it should be remembered that Miss Caraway had never been declared insane, had never been treated for any mental disease, and the proof does not undertake even to show that she was what Blackstone calls "a fool natural." Accordingly the rule announced by Mr. Black in paragraph 262, vol. 1, of the work above referred to applies. His statement is as follows:

"A deed or contract cannot be set aside on the ground of insanity if the person had sufficient mental capacity to understand in a reasonable manner the nature of the particular transaction in which he was engaged and its consequences and effects upon his rights and interests. It is sometimes said that a person has capacity to make a deed if he has sufficient mind to be capable of transacting ordinary business affairs, or of pursuing his own ordinary business in his usual manner. But

this it too loose. The proper inquiry is whether he was capable of understanding and appreciating the nature and effect of the one particular act or transaction which is challenged."

What is the legal meaning of the phrase "undue influence"? Mr. Black, at paragraph 240, thus defines it:

"It is here employed as denoting something wrong, according to the standard of morals which the law enforces in the relations of men, and therefore something legally wrong, something, in fact, illegal. . . . And influence is in this sense undue only when it introduces a transaction which injures some one materially or which is intrinscally unfair or unconscientious. To induce a man to do that which he ought to do, or that which accords with justice, cannot be condemned by the law, no matter how the influence brought to bear upon his mind was acquired or how strenously it was exerted. It is said that the line between due and undue influence as affecting the validity of a deed, when drawn, must be with full recognition of the liberty due to every owner of property to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred."

We refer, also, in this connection, to *Simonton* v. *Bacon,* 49 Miss. 582; *Wherry* v. *Latimer,* 103 Miss. 524, 60 So. 563, 642; *Knox* v. *Knox,* 95 Ala. 495, 11 So. 125, 36 Am. St. Rep. 235. Did, then, the proof of the complainants measure up to the legal standard heretofore laid down by our own court and fully recognized as the substantive law generally?

Perhaps the strongest witness introduced for the complainant was Dr. Sarah Castles. It is impossible to quote in detail all the evidence. It is sufficient to say we have read the testimony with the view of testing its legal sufficiency. Dr. Castles, who performed an operation for what she termed "acites" the middle of October, 1910, states in substance that Miss Caraway was "feeble-minded"; "she wouldn't take any interest in anything;

she would just lay there and wouldn't notice anything
that was going on around her;" that she did not regard
her as being "very strong mentally"; and at another
point in her testimony, the grantor "was mentally de-
fective." This is the strongest language anywhere em-
ployed by the witness and is not based upon a state-
ment of any observations or tests as to the mental
strength or weakness of Miss Caraway; but, on the con-
trary, she states or admits, "I didn't test her." It is
true that Dr. Castles was called as a physician and
treated the patient for physical ailments, but the
substance of her criticism of Miss Caraway's mind is to
the effect that after the operation the patient "wouldn't
carry on a conversation" and "talked in monosylla-
bles"; that she did not seem to want to engage in con-
versation at all, and would not talk unless questions
were propounded to her. Witness Mrs. Morris was an
old acquaintance of Miss Caraway and testified, in
substance, that the latter "would just lie there," and in
her opinion she did not believe Miss Caraway could
understand anything like a deed. On cross-examination,
Mrs. Morris admitted that she had discussed with Miss
Caraway the disposition she expected to make of her
property, and that Miss Caraway intended to execute a
will and devise the property to her sister Mrs. Smith,
and witness was asked the following questions and made
the following responses thereto:

"Q. Did she appear interested in the disposition of
the property? A. Yes, sir. Q. You say this conversa-
tion took place two months before Miss Susan Caraway
died? A. Yes, sir."

Mrs. Kizziah, a daughter of W. B. Caraway, one of
the complainants, also testified in substance that Miss
Caraway "never noticed anything or had anything to
say"; that "she would only answer a question if you
would question her." On cross-examination:

"Q. Did you have any conversation with your aunt,
Miss Susan Caraway? A. Yes, sir. Q. Was she able to

talk intelligently with you? A. Yes, sir; until a few days before she died.  . . .  Q. If you asked her a question, she would give you an answer? A. Yes, sir.''

Witness does emphasize the fact that the last ''few days of her life she would not'' give very intelligent answers to questions and did not seem to recognize visitors who called to see her. The witness identified a letter written by Miss Caraway in her own handwriting, and also a photograph which was incorporated in the record showing the photograph of Miss Caraway and the little boy, Jack Jarvis, taken together; the former sitting in her invalid's chair, and little Jack standing by her side. This witness further testified that her aunt, Mrs. Peterler, sister of the grantor, resided in Houston, Tex., and had visited Miss Caraway about every two years, and that the two corresponded or wrote to each other every three or four days, with the exception of the time just preceding Miss Caraway's death, and there were as many as two letters a day passed between these parties. She also testified that special delivery letters were brought to Miss Caraway along in December, 1910, the month of her death. The original of these letters were not introduced, and the witness was not permitted to detail the contents. This is the sister whom the bill charges exercised undue influence. Mrs. H. L. Tyler, who was not personally acquainted with Miss Caraway, was permitted, over the objections of appellant, to testify to certain admissions made by Mrs. Peterler to the effect that the latter ''kept the mails hot until she got the deeds from Miss Caraway like she wanted them,'' but that the witness did not say what time it was that ''she kept the mails hot.'' Mrs. W. B. Caraway, wife of one of the complainants, also testified that Miss Caraway after the operation appeared to be suffering so, and it was such an effort for her to speak, that ''she gradually went down,'' and ''wouldn't ask for anything.'' To like effect is the testimony of Mrs. W. J. Rogers, who said that after the operation Miss Caraway's physical condition was very bad; that she

was required to remain in bed and had to be propped up; that she would not talk voluntarily, but simply responded to questions. All the witnesses referred to admitted that the grantor would respond to questions, but they emphasize her disinclination to converse. There was no expert witness introduced, and therefore the proof for the complainants rested altogether on lay testimony. No single witness testifies to any pronounced peculiarity of temperament or silly conduct on the part of Miss Caraway. There is shown no hereditary mental disease and no inability on the part of Miss Caraway during the many years of her invalid's life to manage her own business affairs. It is manifest from other testimony that the condition observed by the witnesses was produced by physical weakness ad suffering. No one of the witnesses referred to was present at the time the deed was executed, and no living witness undertakes to state what the physical or mental condition of the grantor was on the day the deed was executed, except witness for the defendant whose testimony we now proceed to detail.

Standing against the scant showing of the complainants is the positive testimony of Mr. Wyatt Easterling, a member of the bar of Meridian in good standing. Mr. Easterling testified that, at the request of Miss Caraway, he drew the deed in question exactly in accordance with the grantor's wishes; that he himself was a notary public and took her acknowledgment to the deed; that there was present besides himself Mrs. M. J. Caraway, the grantor's mother; that he saw Miss Caraway sign the deed with her own hand; that the grantor's mother brought the book upon which she steadied her hands; and that the grantor, while propped up in bed discussed the contents of the deed, signed, and acknowledged it. The witness is very positive that Miss Caraway fully understood what she wanted; that as evidence of this fact, the witness on the day before this deed was executed, had made a draft of a deed for

Miss Caraway, which preliminary draft was presented for her signature; but that "it was not exactly what she wanted, so she refused to sign it." He testifies that this first deed was a conveyance of this property, and that, upon certain objections being made by her, he destroyed the first draft and prepared a second deed with a slight change to meet the criticism which Miss Caraway had made. We quote one or two questions from his testimony:

"Q. At whose instance was the change made in the deeds? A. Miss Susan E. Caraway's. Q. As I understand you, there was something in the first deed that she did not like, and she had you go back and draw up a second deed before she would sign it? A. Yes, sir. Q. Was the correction made in the second deed? A. Yes, sir."

Mr. Easterling furthermore testified that he was connected with the Caraway family and drew up this deed without compensation and as a personal favor to Miss Caraway. There was also introduced for the defendants Dr. W. H. La Parade, a distinguished minister of the gospel, who testified that from 1909 to 1912 he was pastor of the Central Methodist Church of Meridian; that he often visited in the Caraway home; that Miss Caraway was religious, was a member of his church; that at her instance she got the little boy, Jack, to join the church; and that "her life seemed to be centered in Jack." This witness saw Miss Caraway both before and after the operation, and the only change noticeable was that "after the operation her mind seemed to be then a little less alert;" that both before and after the operation she had left "the impression that she wanted Jack to be taken care of." Witness testifies that Miss Caraway appeared to him to be the controling head of the household, and that he observed "no abnormal condition of the mind," but, on the contrary, that she talked to him with reference to the church and about various other topics. Mrs. Percy Scott, another witness, had been ac-

quainted with Miss Caraway for twentw-two or twenty-
three years and lived just across the street from her and
frequently visited her. She bears testimony to Miss
Caraway's state of mind. So likewise does Mr. W. G.
Graham, who was connected with the Meridian Dispatch,
a newspaper, and who says that Miss Caraway was a
regular subscriber to this paper and that witness made
collections from her for the páper up until about the
middle of September, 1910. Mrs. H. H. Easterling,
another witness, lived across the street and frequented
the Caraway home and bears testimony to the affection
that existed between little Jack and his aunt and to cer-
tain declarations that the grantor expected Jack to have
her property. The manifest love and affection existing·
between the grantor and little Jack is also shown by the
witness Mr. C. W. Dunn, and the witness also testifies
to the mental ability of Miss Caraway to dispose of
her property. To like effect is the very clear and con-
vincing testimony of Dr. J. R. Tackett, a prominent phy-
sician of Meridian, who says:          .

"I could not see that there was anything wrong
with her mind at all. She seemed to be all right mental-
ly."

Mr. A. J. Moses, who at one time occupied rooms in
the Caraway home, stated:

"She was as sane as any person I ever talked with
and I spent hours with her in conversation many times."

And Mrs. A. J. Moses says:

"She was well read and well posted on current events
as well as history, was intelligent, and a woman of
strong disposition; that from outward appearance Miss
Susan E. Caraway and her mother regarded the boy
(Jack Jarvis) and treated him almost as an idol."   .

The photograph introduced of Miss Caraway with the
little boy by her side gives silent but appealing testi-
mony of the tender relationship that existed between
them.   One thing stands out prominent in this record un-
·disputed, a fact which cannot possibly be disputed by

word of mouth, and that is Jack C. Jarvis, Jr., at the time
the deed in question was executed, was a minor of tender
years, an innocent child, at that time ignorant of
the execution and delivery of the deed of which
is now sole beneficiary. In the very nature of
things, then, the real party in interest, a minor, had
nothing in the world to do with the execution of this
conveyance, and the learned chancellor went very far
indeed in assuming the responsibility of denying to this
child the right to enjoy the property conveyed. The
other beneficiary, the grantee of the life interest, was
permitted to enjoy the property during her lifetime.

In addition to Mr. Easterling who wrote the deed and
took the acknowledgment, Mrs. M. J. Caraway, the
grantee of the life interest, was the only other witness
who was present at the time the deed was executed.
The testimony of these witnesses, who saw the execu-
tion of the deed and who were taken into the confidnce
of Miss Caraway, is entitled to great weight. As said
by our court in the early case of *Brock* v. *Luckett,* 4
How. 459, in reference to a valid will:

The testimony of the subscribing witnesses "is entitled
to greater weight than the testimony of those who had no
such duty to perform, and especially is entitled to great-
er weight than the testimony of witnesses who were not
present at the time of executing the will, and who did
not see the testator on the day of its execution."

If Miss Caraway could not execute a deed *inter vivos,*
then certainly she was incapacitated to make a will.
Could it be said that one who was only paralyzed in her
lower limbs, and who had never been declared officially
to be an insane person, should be denied the sacred
right of disposing of her property? In the note to
*Slaughter* v. *Heath,* 27 L. R. A. (N. S.) 1, and on page
29 of the volume, is the following:

"Paralysis, no matter how far it may pervade the
system, does not necessarily so affect the mind as to
render a testator incapable of making a will. McDaniel's

Will, 2 J. J. Marsh. (Ky.) 331. The court said: 'A paralysis does not destroy sensation. It impairs muscular power, and prevents the organs of the body from obeying implicitly the will of the mind. It affects the mind in some degree, of course; but its ravages do not prostrate the action of mind and body in the same degree. The faculties of each do not sink *in pari passu*. That which is immaterial and self-evident, and which reasons and thinks and lives forever, does not always slumber when the body is powerless. It may be sane, though occasionally lethargic. It may be sound and active when the tongue and the hand and the eye are incapable of motion; and may conceive and will what they refuse to execute.' "

And in *Simonton* v. *Bacon,* 49 Miss. 582, our court said:

"A mere suggestion of a weakness of intellect alone is not of itself sufficient to avoid the contract; it must be shown that the other party used some undue means to draw him into the agreement."

The supreme court of the United States, in *Ralston* v. *Turpin,* 129 U. S. 663, 9 Sup. Ct. 420, 32 L. Ed. 747, also declares:

"That the grantor in a deed was in a declining state of health . . . when he executed the deed does not necessarily *imply* an absence of sufficient capacity to dispose of property by gift or otherwise."

So, also, is the holding in *Clark* et al. v. *Hartt et al.,* 56 Fla. 775, 47 So. 819.

On mental weakness or feeble mindedness, Mr. Black says:

"Mere mental weakness, or feebleness or dullness of intellect, from whatever cause arising, if it does not amount to imbecility or render the party incapable of understanding the nature and effects of his acts, does not incapacitate him from making a valid deed or contract. Proof of such feeble-mindedness does not overcome the legal presumption of sanity; and a con-

tract or deed made by such person should not be declared void on that ground in the absence of evidence that an unfair advantage was taken of his condition, or that he was the victim of fraud, duress, or undue influence." Black on Rescission and Cancellation, sec. 263.

It is perfectly obvious that the mental weakness or feeble-mindedness must be of such force and effect as destroys the grantor's free agency, and in this connection we direct attention to the fact that the bill does not and could not charge the minor with participating in any acts of duress or undue influence, and the only other party either charged or supposed to have exercised undue influence was the grantor's sister, Mrs. Peterler, who resided in Houston, Tex., far removed from the grantor, and whose influence, if exerted at all, was done through certain letters, the contents of which are not before the court. But the complainants, in attempting to show that this undue influence was exerted through correspondence, draw themselves into an admission that the grantor was mentally capable of carrying on or conducting the correspondence, and that she was writing many letters to her sister during the very month of her death. The disposition which Miss Caraway made of her property appears to us most natural. The proof shows that Mrs. Nellie Jarvis, the mother of little Jack, was a favorite sister of the grantor, and that on the death of this mother the baby boy was taken into the Caraway home in Meridian and very naturally became the object of the solicitude and the bounty of this good woman. If therefore Mrs. Peterler, distantly removed from the scene, did in fact exercise any degree of influence, it would appear to us that her conduct is more to be commended than condemned. Miss Caraway had no dependents, and naturally favored her aged mother and this motherless boy.

This court always proceeds slowly in reversing a chancellor on the facts. But the Constitution invests us with appellate equity jurisdiction, and, in reviewing

this record, we do so as chancellors, charged with the solemn duty of requiring the proof to measure up to legal standards. If, according to our view of the facts and the promptings of our conscience, the learned chancellor was manifestly wrong, then it becomes our plain duty to set aside the decree of the court below and apply the legal test as we see it. We have personally examined the deed; the signature is well written. The chief complaint against the mental capacity of Miss Caraway is that she was a woman of few words; that she would not converse unless interrogated. This criticism is not so severe after all if we remember the words of the Saviour:

"But let your communication be, Yea, yea; Nay, nay; for whatsoever is more than these cometh of evil."

It is perfectly manifest that the grantor's silence was that of a patient and silent sufferer. The decree of the court below will be reversed and, the testimony being fully introduced by both parties, a decree will be entered here in favor of appellants dismissing the bill.

*Reversed and dismissed.*